IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

**FILED**

**May 12, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-1309

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JAMES SCOTT YOCUM,
Defendant Below, Petitioner

---

Appeal from the Circuit Court of Marshall County
Honorable David W. Hummel, Jr., Judge
Civil Action No. 12-F-47

REVERSED

---

Submitted: January 14, 2014
Filed: May 12, 2014

Brent A. Clyburn, Esq.                    Patrick Morrisey, Esq.
The Law Office of Brent A. Clyburn        Attorney General
Wheeling, West Virginia                   Scott E. Johnson, Esq.
Counsel for Petitioner                    Senior Assistant Attorney General
                                          Charleston, West Virginia
                                          Counsel for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.
JUSTICE BENJAMIN dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1. "In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt." Syl. Pt. 1, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965).

2. A threat to sexually assault the child of an individual police officer by a person who is under arrest, handcuffed, and in the patrol car, does not constitute a terrorist act within the meaning of West Virginia Code § 61-6-24(a)(3)(B)(iii) (2010) because the threatened action was not directed at intimidating or coercing the conduct of a branch or level of government.

LOUGHRY, Justice:

James Scott Yocum appeals from the October 1, 2012, sentencing order of the Circuit Court of Marshall County denying his motions to dismiss or, alternatively, acquit in connection with a felony conviction for making a threat to commit a terrorist act.[1] The petitioner seeks to set aside his conviction[2] on grounds that the criminal offense set forth in West Virginia Code § 61-6-24(b) (2010) is unconstitutionally vague and that the State's evidence was insufficient to prove he committed the subject offense. While we do not find the challenged statute to be void for vagueness, we conclude that the State failed to introduce the necessary evidence to prove that Mr. Yocum committed the felony offense at issue. Accordingly, we reverse.

## I. Factual and Procedural Background

Shortly after midnight on February 9, 2012, the Moundsville police responded to a domestic violence call. One of the responding officers, Sergeant Shawn A.,[3] arrested Mr. Yocum for domestic violence, and proceeded to transport him to the Northern Regional

---

[1] *See* W.Va. Code § 61-6-24 (2010).

[2] Mr. Yocum was sentenced to serve not less than one year nor more than three years in the penitentiary with seventy-four days credit awarded for time served.

[3] Given that threats were made by the petitioner against members of Sergeant A.'s family, we will refer to him by initial only. *See State ex rel. Paul B. v. Hill*, 201 W.Va. 248, 250 n.1, 496 S.E.2d 198, 200 n.1 (1997).

1

Jail after booking. Because Mr. Yocum was complaining of chest pains, the jail refused to accept him. As a result, Sergeant A. drove Mr. Yocum to Reynolds Hospital, where he was determined not to require further medical attention and released.

While at the hospital awaiting to be examined, Mr. Yocum had been loud and used profanity.[4] After leaving the hospital, Mr. Yocum continued to yell, as he had at the hospital, that he was not going to jail.[5] He leaned on the partition in the patrol car and shouted at Sergeant A. that he knew where the police officer lived and that "[h]e was going to fu\*k my [Sergeant A.'s] daughter." Following this statement, Mr. Yocum stated "[y]eah, after I get out of jail, I'll be fu\*king your wife, and I'll fu\*k your daughters."

Based on these statements Mr. Yocum made to Sergeant A. while handcuffed and in the back of the patrol car,[6] he was indicted for threatening to commit a terrorist act pursuant to West Virginia Code § 61-6-24. Following a one-day trial, on September 10, 2012, the petitioner was convicted of one count of threatening to commit a terrorist act.

---

[4]At the doctor's insistence, Mr. Yocum was handcuffed during the examination. Although the State suggests that the petitioner was combative towards Sergeant A. while at the hospital, the officer testified to the contrary.

[5]The petitioner's boisterous rants were filled with profanity.

[6]In explanation of these statements, Mr. Yocum testified at trial that Sergeant A. taunted him by saying you are "going to prison for a long time," and following that with: "I got the keys to your house. I'll be fu\*king your old lady." At trial, the officer denied making those statements.

2

Through this appeal, Mr. Yocum seeks relief from the denial of his post-trial motions to dismiss or, alternatively, to acquit.

## II.  Standard of Review

When the constitutionality of a statute is challenged, the scope of our review is necessarily plenary.  *See* Syl. Pt. 1, *State v. Rutherford*, 223 W.Va. 1, 672 S.E.2d 137 (2008) ("The constitutionality of a statute is a question of law which this Court reviews *de novo*.").  With regard to the petitioner's assignment of error predicated on insufficiency of evidence, the standard we articulated in *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), continues to be our guidepost:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden.  An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.  The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt.  Credibility determinations are for a jury and not an appellate court.  Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part.

With these two standards in mind, we proceed to determine whether the circuit court committed error in denying post-conviction relief to the petitioner.

## III. Discussion

### A. Constitutionality of Statute

In challenging the criminal offense set forth in West Virginia Code § 61-6-24(b)[7] on grounds of vagueness, the petitioner looks to the language that defines a "terrorist act." By statute, a "terrorist act" is "an act that is:

> (A) Likely to result in serious bodily injury or damage to property or the environment; and
> (B) Intended to:
> (i) Intimidate or coerce the civilian population:
> (ii) Influence the policy of a branch or level of government by intimidation or coercion;
> (iii) Affect the conduct of a branch or level of government by intimidation or coercion; or
> (iv) Retaliate against a branch or level of government for a policy or conduct of the government."

W.Va. Code § 61-6-24(a)(3). The specific language upon which Mr. Yocum rests his vagueness claim is the requirement that the act at issue is "[l]ikely to result in serious bodily injury." *Id.*

---

[7]The offense at issue occurs when "[a]ny person . . . knowingly and willfully threatens to commit a terrorist act with or without the intent to commit the act. . . ." W.Va. Code § 61-6-24(b).

4

"[B]ecause a statute is presumed to be constitutional," our examination of a constitutional challenge to a legislative enactment necessarily involves judicial restraint. *State v. James*, 227 W.Va. 407, 413, 710 S.E.2d 98, 104 (2011). The reasons for such restraint were fully articulated in syllabus point one of *State ex rel. Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965):

> In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

Given our clear preference for upholding legislative enactments, this Court "will interpret legislation in any reasonable way which will sustain its constitutionality." *State v. Legg*, 207 W.Va. 686, 694, 536 S.E.2d 110, 118 (2000); *accord* Syl. Pt. 3, *Slack v. Jacob*, 8 W.Va. 612 (1875) ("Wherever an act of the Legislature can be so construed and applied as to avoid a conflict with the Constitution, and give it the force of law, such construction will be adopted by the courts.").

The petitioner maintains that because he and the State disagree regarding the meaning of the phrase "likely to result in serious bodily injury," this renders the statute

5

unconstitutionally vague.[8]  As the State correctly observes, the mere fact of disagreement among the parties does not compel the conclusion that a statutory provision is vague. *See In re Resseger's Estate*, 152 W.Va. 216, 220, 161 S.E.2d 257, 260 (1968) ("That the parties disagree as to the meaning or the applicability of each provision does not of itself render either provision ambiguous or of doubtful, uncertain or obscure meaning."); *accord Planned Parenthood v. State of Arizona*, 718 F.2d 938, 948 (9th Cir. 1983) ("Substantial numbers of lawsuits arise out of disagreements over the precise meaning of a statute.  The potential for such differences of opinion cannot be enough to render a statute void for vagueness."); *Southwestern Bell Telephone Co. v. City of El Paso*, 168 F.Supp.2d 640, 645 (W.D. Tex. 2001) ("While the parties argue over the interpretation of the word 'public' in the statute, this disagreement does not render it void for vagueness."); *State v. Mattiolo*, 556 A.2d 584, 587 (Conn. 1989) ("Honest disagreement about the interpretation of a statutory provision does not, however, make the statute ambiguous or vague.").

As additional support for a finding of constitutional deficiency, the petitioner asserts his due process rights were violated by failing to provide him with notice as to the elements of the offense.  Mr. Yocum looks to the long-established principle that "a criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence

---

[8]According to Mr. Yocum, the State views the language in speculative terms whereas the petitioner believes that the statute refers to a reasonable expectation or probability that an event will occur.

6

fair notice that his contemplated conduct is prohibited by statute." *State v. Flinn*, 158 W.Va. 111, 117, 208 S.E.2d 538, 542. As we observed in *State ex rel. Appleby v. Recht*, 213 W.Va. 503, 583 S.E.2d 800 (2002), "[t]he void for vagueness doctrine is an aspect of the due process requirement that statutes set forth impermissible conduct with sufficient clarity that a person of ordinary intelligence knows what conduct is prohibited and the penalty if he transgresses these limitations." *Id.* at 518, 583 S.E.2d at 815.

In an attempt to cast the criminal statute as running afoul of constitutional protections, the petitioner suggests that enhanced scrutiny applies for determining the issue of vagueness because speech is involved in making a threat to commit a terrorist act. In *Flinn*, this Court explained the distinction between examining general criminal statutes and those that govern potential First Amendment[9] and similarly sensitive constitutional rights for vagueness purposes. 158 W.Va. at 118-19, 208 S.E.2d at 543. In the case of general criminal statutes, the review entails an examination of both the face of the statute and by considering the statute in the light of the conduct to which it is applied. *Id.* at 119, 208 S.E.2d at 543. In contrast, those statutes that govern First Amendment rights such as speech are "strictly tested for certainty by interpreting their meaning from the face of the statutes." 158 W.Va. at 118, 208 S.E.2d at 543.

---

[9]U.S. Const. amend. I.

We reject the petitioner's argument that West Virginia Code § 61-6-24 must be subjected to the stricter "void for vagueness" analysis that pertains to criminal statutes which address or affect freedom of speech. Certain categories of speech are considered to fall outside the protections afforded by the First Amendment. *See generally U.S. v. Alvarez*, 132 Sup. Ct. 2537, 2544 (2012) (identifying permissible content-based restrictions on speech as including advocacy intended to incite imminent lawless action; obscenity; defamation; "fighting words;" child pornography; and true threats). Among those recognized types of speech that can be subject to restriction and thus fall outside the broad protections of the First Amendment, is speech integral to criminal conduct. In *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949), the United States Supreme Court held that the constitutional freedom of speech and press does not immunize speech or writing used as an integral part of conduct in violation of a criminal statute. *Id.* at 498. Because the speech to which Mr. Yocum seeks to attach First Amendment protections was integrally connected to the criminal conduct at issue, the statute is viewed as a general criminal statute for purposes of conducting a vagueness analysis. *See Flinn*, 158 W.Va. at 119, 208 S.E.2d at 543.

In deciding whether the challenged language "likely to result in serious bodily injury" is vague, we consider whether a potential offender has been given notice of the type of conduct he should avoid committing. *See* Syl. Pt. 1, in part, *State ex rel. Myers v. Wood*, 154 W.Va. 431, 175 S.E.2d 637 (1970) ("The basic requirements [to satisfy due process] are

8

that such a statute must be couched in such language so as to notify a potential offender of a criminal provision as to what he should avoid doing in order to ascertain if he has violated the offense provided and it may be couched in general terms."). We find the language at issue to be patently clear in its meaning and in need of no further interpretation by this Court to place a potential offender on notice as to what conduct is proscribed: any conduct, that if effectuated, has the anticipated potentiality to cause serious bodily harm.[10] "'The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more.'" *Flinn*, 158 W.Va. at 118, 208 S.E.2d at 542 (quoting *United States v. Petrillo*, 332 U.S. 1, 7-8 [1947]). Accordingly, we find the challenged language of West Virginia Code § 61-6-24 to be free from constitutional defect.

## B. Sufficiency of Evidence

The State argues that it adduced sufficient evidence for the jury to conclude that it proved all the elements of West Virginia Code § 61-6-24 to convict the petitioner for the offense of threatening to commit a terrorist act. In deciding whether the State proved its case, we look to the indictment to identify the specific allegations of criminal conduct at

---

[10]While the challenged language involves "serious bodily injury," the statute also includes damage to property and the environment. Each of the statutorily-defined "terrorist acts" must have been threatened for the purpose of accomplishing one of four specified intentions. *See* W.Va. Code § 61-6-24(a)(3).

issue. As set forth in the indictment, following his arrest for domestic battery and petit larceny, Mr. Yocum, during transport to the Northern Regional Jail, "repeatedly threatened Detective A. . . . that he knew where he lived and he was going to sexually assault his daughter." After relating that Detective A. has two step-daughters, ages 9 and 12 years old, the indictment provides that the petitioner "made the said threats in an attempt to intimidate or coerce Detective A. regarding his duty as a Moundsville Police Officer, against the peace and dignity of the State of West Virginia and W. V[a]. Code § 61-6-24[a](3)(iii) ."[11]

Focusing on the pertinent language of West Virginia Code § 61-6-24, the State was required to prove that Mr. Yocum knowingly and willingly threatened to commit an act that was likely to result in serious bodily injury *and* intended to affect the conduct of a branch or level of government by intimidation or coercion. *See* W. V. Code § 61-6-24(a)(3)(iii), (b). As an initial matter, we find it wholly unnecessary to engage in the protracted discussion the parties pursued with regard to whether a sexual act forced upon a young girl would be likely to cause her harm,[12] as we take judicial notice of the fact that sexual acts forced upon a young girl would likely result in serious injury. We proceed to examine whether the petitioner's threat was intended, by means of intimidation or coercion, to affect the conduct

---

[11]Subsection (a) was omitted from the criminal citation in the indictment. It is clear from the language used in the indictment that the charge was brought pursuant to West Virginia Code § 61-6-24(a)(3)(iii).

[12]The petitioner did not know the age of Sergeant A.'s stepdaughters or even if he had any children at the time he uttered the statements at the center of this case.

10

of a branch or level of government. To meet this element of the statute, the State suggests that "the jury could have found that the purpose of the threat was to intimidate Officer A. into disregarding his duty of ensuring that the Petitioner was incarcerated at the Northern Regional Jail."

As was the case with many other states, our anti-terrorism statute, West Virginia Code § 61-6-24, was enacted in direct response to the events of September 11, 2001.[13] Given the undeniably momentous, nation-shaping, and security-altering predicate for the subject legislation, we find it prudent to consider the dual aim of our anti-terrorism statute: to thwart and/or punish future instances of qualifying acts of terrorism. And, while we are forced to decide this case without the benefit of legislative history,[14] we are not required to resolve issues of significant consequence in a legal vacuum or without guidance. As this is the first case that has reached us under our anti-terrorism statute, we find it useful to consider how New York has addressed analogous concerns raised in regards to its anti-

---

[13]West Virginia Code § 61-6-24 was enacted in the sixth extraordinary session of 2001 and went into effect on November 30, 2001. *See* 2001 W.Va. Acts, 6th Ex. Sess., c. 23.

[14]In the legislative findings of its anti-terrorism act, New York lists the following examples of terrorism: (1) the September 11, 2001, attacks on the World Trade Center and the Pentagon; (2) the bombings of American embassies in Kenya and Tanzania in 1998; (3) the destruction of the Oklahoma City federal office buildings in 1995; (4) the mid-air bombing of Pan Am Flight number 103 in Lockerbie, Scotland, in 1988; (5) the 1997 shooting from atop the Empire State Building; (6) the 1994 murder of Ari Halberstam on the Brooklyn Bridge; and (7) the bombing at the World Trade Center in 1993. *See* N.Y. Penal Law § 490.00 (Consol. Supp. 2014).

11

terrorism law.  *See Jenkins v. City of Elkins*, 230 W.Va. 335, 349, 738 S.E.2d 1, 15 (2012) (recognizing need for extrajurisdictional guidance in addressing matters of first impression).

In *People v. Morales*, 982 N.E.2d 580 (N.Y. 2012), the New York Court of Appeals examined whether multiple acts of violence directed at rival gangs could properly come within that state's anti-terrorism legislation.  At issue was whether the subject criminal action was committed with the requisite "intent to intimidate or coerce a civilian population." *Id.* at 584 (discussing New York Penal Law 490); *cf.* W.Va. Code § 61-6-24(a)(3)(B)(i).[15] The New York Appeals Court began its analysis in *Morales* by stating that the statutorily-undefined phrase must be accorded "its 'most natural and obvious meaning' based on common sense and reasonableness in the context of the purpose and history of the terrorism statutes. . . ."  982 N.E.2d at 584 (internal citations omitted).  In explanation of its decision to refrain from adopting a precise definition of "civilian population," the appellate court observed that the evidence adduced at trial revealed a discrete criminal transaction against identified gang enemies, rather than an attempt to intimidate or coerce the entire Mexican-American community in this Bronx neighborhood. *Id*. at 585.  Of critical import to the Court in *Morales* was the fact that

there is no indication that the legislature enacted article 490 of

[15]That section defines a terrorist act as including "an act that is: Likely to result in serious bodily injury or damage to property or the environment; and (B) Intended to: (i) Intimidate or coerce the civilian population."  W.Va. Code § 61-6-24(a)(3)(B)(i).

12

the Penal Law with the intention of elevating gang-on-gang street violence to the status of terrorism as that concept is commonly understood. Specifically, *that statutory language cannot be interpreted so broadly so as to cover individuals or groups who are not normally viewed as "terrorists"* . . . .

*Id.* (emphasis supplied).

The Court in *Morales* recognized that the New York Legislature consulted the federal definition of "international terrorism" in framing its anti-terrorism statutes:

The federal antiterrorism statutes were designed to criminalize acts such as "the detonation of bombs in a metropolitan area" or "the deliberate assassination of persons to strike fear into others to deter them from exercising their rights"–conduct that is not akin to the serious offenses charged in this case.

982 N.E.2d at 585 (footnote omitted). In rejecting the application of the anti-terrorism law to the gang violence at issue in *Morales*, the appellate court reasoned that "*the concept of terrorism has a unique meaning and its implications risk being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act.*" *Id.* at 586 (emphasis supplied). As the New York Legislature recognized with the adoption of its anti-terrorism law, acts of terrorism typically involve politically-motivated and mass-targeted harm caused by incendiary or other means capable of causing significant mortal injuries. *See supra* note 14.

13

Turning to the case before us, we are asked to decide whether the actions of Mr. Yocum, in threatening to sexually assault the daughter of his arresting officer, come within the definition of proscribed terrorist acts set forth in West Virginia Code § 61-6-24(a)(3). In seeking to prosecute the petitioner under our anti-terrorism statute, the State framed its case as a threat intentionally made "to intimidate Officer A. into disregarding his duty of ensuring that the Petitioner was incarcerated at the Northern Regional Jail." Even assuming that Mr. Yocum's statements were articulated for the express purpose of preventing his incarceration,[16] to constitute a "terrorist act" those statements are still required to satisfy the Legislature's intent in proscribing threats directed at and intended to affect the conduct of a branch or level of government by means of intimidation or coercion. *See* W.Va. Code § 61-6-24(a)(3)(B)(iii).

In the same manner that the Court in *Morales* found it necessary to consider both the precipitating events for its anti-terrorism statutes and the federal source for its law, we are mindful that our Legislature was similarly motivated and likely to have consulted federal definitions of terrorism in framing West Virginia Code § 61-6-24. And while this Court readily acknowledges the existence of multiple definitions of terrorism,[17] we doubt that

[16]*See* Syl. Pt. 3, *Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (according State benefit of inferences and credibility determinations in review of evidence for sufficiency purposes).

[17]*See* Nicholas J. Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Too Many Grails,* 30 J. Legis. 249 (2004) (discussing twenty-two definitions of

(continued...)

14

anyone would disagree with the sage observation in *Morales* that "the concept of terrorism has a unique meaning." 982 N.E.2d. at 586. Despite the variance in statutory enactments which address terrorism, there is a consensus that both violence and a political purpose or motivation are universal components included in this type of legislation. *See* Nicholas J. Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Too Many Grails,* 30 J. Legis. 249, 251 (2004) (recognizing that "vast majority of definitions of terrorism contain some reference to the two most common components . . . violence and a political purpose or motivation") (footnote omitted).

Against this background, we consider what the Legislature intended when it created an offense for threatening action against a branch or level of government by means of intimidation or coercion. *See* W.Va. Code § 61-6-24(a)(3)(B)(iii). Consistent with our statutory obligation to give effect to each word of a statute and to construe it in accord with the import of its language,[18] we cannot gloss over the fact that the terms "level" and "branch" suggest that the Legislature was contemplating threats of terrorist activity aimed not at individuals such as Sergeant A. in this case, but instead at the institutional level. It is noteworthy that not one of the four delineations of the intent necessary to come within the

[17](...continued)
terrorism in federal law).

[18]*See* Syl. Pt. 6, *State ex rel. Cohen v. Manchin*, 175 W.Va. 525, 336 S.E.2d 171 (1984).

15

definition of a "terrorist act" is framed in terms of causing harm to an individual. *See* W.Va. Code § 61-6-24(a)(3)(B)(i)-(iv). The first definition of the requisite intent necessary to commit a statutorily-defined "terrorist act" involves conduct aimed at the civilian population as a whole and the remaining three *all* require conduct that is directed at a branch or level of government as a whole. *See id.*

In this case, the threat that was prosecuted by the State was clearly not aimed at a branch or level of government but solely at an individual police officer. Consequently, we have little difficulty in concluding that a threat to sexually assault the child of an individual police officer by a person who is under arrest, handcuffed, and in the patrol car, does not constitute a terrorist act within the meaning of West Virginia Code § 61-6-24(a)(3)(B)(iii) because the threatened action was not directed at intimidating or coercing the conduct of a branch or level of government. To hold otherwise would not only require us to turn a blind eye to the overarching objective of our state's anti-terrorism law but would run the risk of trivializing the offense at issue. *See Morales*, 982 N.E.2d at 586.

Rather than sanctioning overzealous prosecution, we take this opportunity to encourage both law enforcement and the prosecutors of this state to charge individuals with offenses that properly encompass the alleged wrongdoing at issue. In this case, the State could have charged Mr. Yocum with a violation of West Virginia Code § 61-5-27 (2010),

16

which criminalizes the actions of individuals who seek to intimidate or retaliate against public officers and employees by threats of physical force or harassment in an attempt to impede or obstruct that individual from performing his or her official duties.[19]  Instead, the State sought to overreach and punish Mr. Yocum for the type of impulsive empty "threat" that any seasoned police officer such as Sergeant A.[20] regularly encounters in the course of his duties–a threat that falls well outside the definitional parameters of terrorist activity.[21] *See* W.Va. Code § 61-6-24(a)(3)(B)(i)-(iv).

## IV.  Conclusion

Based on the foregoing, the decision of the Circuit Court of Marshall County is reversed.

Reversed.

---

[19]Depending on the specific acts involved, a conviction under West Virginia Code § 61-5-27 could result in either a misdemeanor conviction and a jail term of up to one year plus a fine of up to $1,000, or a felony conviction with a prison sentence of one to ten years plus a fine of up to $2,000.  *See* W.Va. Code § 61-5-27(d), (e).

[20]Sergeant A. had been on the force for fifteen years at the time of the incident that is the subject of this case.

[21]Sergeant A.'s testimony that he would have charged Mr. Yocum for violating the anti-terrorism statute even if he did not have a stepdaughter suggests an overly-zealous approach to the use of our statute.