IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

**FILED**

**June 5, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0775

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

ZACHARY ALLEN KNOTTS, JR.,
Defendant Below, Petitioner

Appeal from the Circuit Court of Marion County
The Honorable David R. Janes, Judge
Criminal Action No. 11-F-33

AFFIRMED

Submitted: April 22, 2014
Filed:  June 5, 2014

S. Sean Murphy, Esq.
Morgantown, West Virginia
Attorney for the Petitioner

Patrick Morrisey, Esq.
Attorney General
Scott E. Johnson, Esq.
Senior Assistant Attorney General
Julie M. Blake, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorney for the Respondent

The Opinion of the Court was delivered PER CURIAM.

Justice Benjamin concurs and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.        "'In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied.  The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard.  Questions of law are subject to a *de novo* review.'  Syllabus Point 1, *Public Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996)."  Syl. Pt. 1, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).

2.        "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

Per Curiam:

On September 30, 2010, the Petitioner, Zachary Allen Knotts, Jr., was arrested

and charged with the offense of threats of terrorist acts in violation of West Virginia Code

§ 61-6-24 (2013).[1]  The Petitioner was indicted on February 7, 2011, and the State filed a

motion for a competency evaluation.[2]  The Circuit Court of Marion County, West Virginia,

held a hearing on the issue of the Petitioner's competency on March 11, 2011.  By order

_____

[1]West Virginia Code § 61-6-24(b) provides:

> Any person who knowingly and willfully threatens to
> commit a terrorist act, with or without the intent to commit the
> act, is guilty of a felony and, upon conviction thereof, shall be
> fined not less than $5,000 nor more than $25,000 or confined in
> a state correctional facility for not less than one year nor more
> than three years, or both.

Additionally "[t]errorist act" is defined within the statute to mean:

> (A) Likely to result in serious bodily injury or damage to
> property or the environment; and
> (B) Intended to:
> (i) *Intimidate or coerce the civilian population*;
> (ii) Influence the policy of a branch or level of government by
> intimidation or coercion;
> (iii) Affect the conduct of a branch or level of government by
> intimidation or coercion; or
> (iv) Retaliate against a branch or level of government for a
> policy or conduct of the government.

*Id*.  (emphasis added).

[2]The appendix record does not contain any of the competency motions, evaluations,
hearing transcripts on the competency issue.

1

entered March 23, 2011,[3] the circuit court determined that the Petitioner was not competent to stand trial and he was committed to William R. Sharpe, Jr. Hospital until either the circuit court lost jurisdiction over him or until such time as he was found competent to stand trial, whichever event occurred sooner. On March 4, 2013, the Petitioner filed a Motion for Opportunity to Offer a Defense to the Charges Pending Against the Defendant[4] pursuant to W. Va. Code § 27-6A-6 (2013).[5] Pursuant to the statute,[6] the circuit court conducted a bench

---

[3]An additional competency hearing was held on June 29, 2011, based on a competency evaluation from William R. Sharpe, Jr. Hospital. The circuit court again found that the Petitioner was not competent to stand trial and was not substantially likely to attain competency. The circuit court again ordered that the Petitioner be committed to a mental health facility until the circuit court loses jurisdiction over the Petitioner on February 1, 2014, or whenever the Petitioner regained competency, whichever was sooner. The Petitioner's counsel reported to the Court that the Petitioner was released from his criminal commitment on or around February 1, 2014, but was thereafter civilly committed in a proceeding instituted by the prosecutor.

[4]The State did not respond to this motion.

[5]W. Va. Code § 27-6A-6 provides:

> If a defendant who has been found to be not competent to stand trial believes that he or she can establish a defense of not guilty to the charges pending against him or her, other than the defense of not guilty by reason of mental illness, the defendant may request an opportunity to offer a defense thereto on the merits before the court which has criminal jurisdiction. If the defendant is unable to obtain legal counsel, the court of record shall appoint counsel for the defendant to assist him or her in supporting the request by affidavit or other evidence. If the court of record in its discretion grants such a request, the evidence of the defendant and of the state shall be heard by the court of record sitting without a jury. If after hearing such petition the court of record *finds insufficient evidence to support a conviction, it shall dismiss the indictment and order the*

(continued...)

2

trial on June 26, 2013. By order entered July 2, 2013, the circuit court found sufficient evidence to sustain a conviction of a terrorist threat pursuant to West Virginia Code § 61-6-24. The Petitioner argues that the circuit court erred by finding that his statements to employees of a credit union amounted to a threat against the civilian population as set forth in West Virginia Code § 61-6-24. Having reviewed the parties' briefs and arguments, the appendix record and all other matters before the Court, we affirm the decision of the circuit court.

## I. Facts

The Petitioner had been a member of the Fairmont Federal Credit Union ("the credit union") located in Fairmont, West Virginia. Due to the Petitioner's odd behavior of confronting customers and employees, which was caused by a brain injury he sustained in 2002, the credit union terminated his membership and closed his accounts. On September 30, 2010, the Petitioner made at least three phone calls to the credit union. Randi Lynn Morris, a call service representative for the credit union, testified that the first call she had with the Petitioner lasted about thirty minutes. The call concerned the Petitioner's account

[5](...continued)
> *release of the defendant from criminal custody.* The release order, however, may be stayed for ten days to allow civil commitment proceedings to be instituted by the prosecutor pursuant to article five of this chapter: Provided, That a defendant committed to a mental health facility pursuant to subsection (f) or (h), section three of this article shall be immediately released from the facility unless civilly committed.

[6]*See id.* (emphasis added).

being closed by the credit union. Ms. Morris stated that during the second call, the Petitioner asked to speak to management and became more upset. Also during this call, the Petitioner told her

> we were horrible people and he was going to come in and he was going to let the world know how he felt about the credit union. At which point he said that he was going to place devices on our car to explode the cars and then he would let everybody see what he was going to do, because he was going to put DVD's across our property to let everybody watch.[7]

Ms. Morris reported the explosives threat to her supervisor. The credit union was placed on lock-down. The Petitioner called a third time and Ms. Morris immediately terminated the call, which is what she was instructed to do by her supervisor.

Chief Investigating Officer Clarence Phillips of the Marion County Sheriff's Department testified that he interviewed multiple bank employees on September 30, 2010. The employees told the officer that the credit union had decided to close the Petitioner's account because he had been approaching pregnant employees and customers and attempting to engage in conversations regarding circumcision with them. The officer testified that Ms.

---

[7]Ms. Morris never mentioned the threat of explosives in her statement to law enforcement; however, she did tell the investigating officer about the threat when he arrived at the scene. Ms. Morris was cross-examined by the Petitioner's counsel regarding the lack of any mention of the placement of explosives on employees' cars in her written statement. She could not explain why the statement about explosive devices was not included in the written statement. Nevertheless, she stated that she had no doubt that the Petitioner made that statement to her about placing explosive devices on the cars at the credit union. Ms. Morris's written statement is not in the appendix record before this Court.

Morris told him that the Petitioner threatened to place explosive devices on credit union employees' vehicles.

The Petitioner testified and denied telling Ms. Morris that he would place explosives on the employees' vehicles. The Petitioner claimed that all he wanted to do was place copies of e-mails and DVDs on the vehicles in the credit union parking lot to expose the credit union's violation of his First Amendment[8] right to freely speak about circumcision.

By order entered July 2, 2013, the circuit court determined that sufficient evidence existed to conclude that the Petitioner made a threat of terrorist acts. Specifically, the circuit court concluded that:

> there is sufficient circumstantial evidence in this case from which a jury could infer that Mr. Knotts made a terroristic threat to employees at the Credit Union. Specifically, a Credit Union employee testified that Mr. Knotts called the bank frequently on the day of the alleged threat, and that she spoke with Mr. Knotts on three separate occasions that day. More persuasive, however, was testimony from Ms. Morris that the defendant stated to her that he would "come in and let the world know what he thought about the Credit Union" by placing "explosive devices" on <u>all</u> of the Credit Union employees' vehicles. Additionally, Sergeant C.L. Phillips testified that he was the investigating officer on September 30, 2010, and that Ms. Morris gave a verbal statement to him wherein she informed him that Mr. Knotts said he would place explosive devices on the Credit

---

[8]U.S Const. amend I.

5

Union employees' vehicles. Finally, although he denied making any threat regarding explosives to bank employees, during Mr. Knotts's direct testimony, Mr. Knotts admitted that he called the Credit Union eleven (11) times one day.

Further, the Court is of the opinion that, although the alleged threat was made to members in a certain class, i.e., bank employees, there is sufficient evidence that the threat pertained to the civilian population at large. Mr. Knotts allegedly threatened to place explosive devices on employees' vehicles in a parking lot used by the bank's employees and customers. The Court cannot ignore the large risk that such a threat poses to citizens in the community who are not employees of the Credit Union.

It is from this order that the Petitioner now appeals.

## II. Standard of Review

This Court recognized in *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), that the standard of review of a circuit court's judgment following a bench trial is as follows:

In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review. Syllabus Point 1, *Public Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).

*Mechling*, 219 W. Va. at 371, 633 S.E.2d at 316 and Syl. Pt. 1.

Additionally, because the Petitioner's claim challenges the sufficiency of the evidence presented to the circuit court during the bench trial and because under the

6

provisions of West Virginia Code § 27-6A-6, a circuit court is permitted to release a defendant from criminal custody if it "finds insufficient evidence to support a conviction[,]" we review the sufficiency of the evidence under the standard of review established in *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995); *see also State v. White*, 228 W. Va. 530, 539-40, 722 S.E.2d 566, 575-76 (2011) (applying standards of review set forth in *Guthrie* to petitioner's argument that trial court erred in failing to grant both his pre-verdict and post-verdict motions for judgment of acquittal, which were based upon insufficiency of the evidence). Thus, as this Court held in *Guthrie*,

> [t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 1. We will now consider the issue before us.

### III. Discussion

The issue before the Court is whether there was sufficient evidence to support the circuit court's determination that the Petitioner knowingly and willfully threatened to commit a terrorist act, with or without the intent to commit the act. W. Va. Code § 61-6-24. More particularly at issue is whether the Petitioner's conduct falls within the statutory definition of "[t]errorist act." *Id.* § 61-6-24(a)(3). "Terrorist act" is defined within the statute as "[l]ikely to result in serious bodily injury or damage to property or the

7

environment; *and . . .* [i]ntended to . . . [i]ntimidate or coerce the civilian population[.]"[9] *Id.* (emphasis added).

The Petitioner argues that his statements to an employee of the credit union did not amount to a threat against a civilian population under the statute. The Petitioner maintains that "becoming angry with the employees at a branch of the local credit union and threatening to blow up their cars is not an effort to intimidate the civilian population." Instead, according to the Petitioner, the statements were "the rantings [sic] of a mentally disabled person who was angry and who is incapable of articulating his displeasure in a socially acceptable manner." Conversely, the State argues that it produced sufficient evidence that the Petitioner's threat to blow up cars of credit union employees was intended to "intimidate or coerce the civilian population." *Id.*

The Petitioner, relying upon *People v. Morales*, 982 N.E.2d 580 (N.Y. 2012),[10]

---

[9]The State only offered evidence that the Petitioner's action intended to "intimidate or coerce a civilian population[,]" as there was no evidence that the Petitioner's action was in any way directed at "a branch or level of government." W. Va. Code § 61-6-24(a)(3)(B)(i) and (ii)-(iv).

[10]The Petitioner actually relies upon the decision of the New York Supreme Court, Appellate Division. *See Morales*, 911 N.Y.S.2d 21 (N.Y. App. Div. 2010). That decision, however, was ultimately appealed to the New York Court of Appeals. *See* 982 N.E.2d 580. Even though the New York Court of Appeals affirmed the lower court's decision that the defendant's offenses in a gang-related shooting were not acts of terrorism, the language and reasoning from the New York Court of Appeals is controlling and relied upon herein, not the

(continued...)

maintains that the threat to blow up cars belonging to the credit union employees was not

"intended to intimidate or coerce the civilian population."[11]   In *Morales*, the defendant went

with a fellow gang member to a christening party. While at the party, the defendant

confronted the victim whom the defendant thought was a rival gang member.  The rival gang

was responsible for the death of one of the defendant's friends.  *Id*. at 583.  The defendant

and his gang told the rival gang member to leave the party and, when he refused, the

defendant and his gang decided to assault him.  *Id*.  After leaving the party the defendant and

his gang again confronted the rival gang member.  *Id*.  A fight broke out and during the fight

a rival gang member and a child were shot.  *Id*.  The rival gang member was paralyzed and

---

[10](...continued)
language of the lower court that was relied upon by the Petitioner.

[11]We cited and favorably discussed *Morales* in *State v. Yocum*, 2014 WL 2017843, ___ W. Va. ___, ___ S. E.2d ___ (W. Va. filed May 12, 2014), a case in which the Petitioner had threatened a member of a police officer's family and was charged with the crime of  a terrorist act against a branch or level of government. We ultimately held in syllabus point two of *Yocum* that

> A threat to sexually assault the child of an individual police officer by a person who is under arrest, handcuffed, and in the patrol car, does not constitute a terrorist act within the meaning of West Virginia Code § 61-6-24(a)(3)(B)(iii)(2010) because the threatened action was not directed at intimidating or coercing the conduct of a branch or level of government.

the child died.  *Id*.

The prosecution, in *Morales,* charged the defendant with crimes of terrorism under New York Penal Law § 490.25 (McKinney 2001)(establishing "crime of terrorism" as "[a] person is guilty of a crime of terrorism when, with intent to intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unity of government by murder, assassination or kidnapping, he or she commits a specified offense.").   The jury convicted the defendant.  Upon appeal, the intermediate appellate court reversed the defendant's conviction, finding insufficient evidence to prove "an intent to intimidate or coerce a civilian population because the People established only gang-related street crimes, not terrorist acts."  982 N.E.2d at 583-84.

Upon the state's appeal to the New York Court of Appeals, the court affirmed the intermediate court's determination that insufficient evidence existed to establish the defendant's guilt of committing crimes of terrorism. *Id*. at 586.  In reaching its decision, the New York court acknowledged that "civilian population" found within the New York statute "could be read broadly to encompass a variety of communities depending on how the relevant 'area' is defined and who lives within that territory.  Conceivably, it could range from the residents of a single apartment building to a neighborhood, city, county, state or even a country." *Id*. at 584.  The court, however, ultimately found it unnecessary to define the contours of the phrase "civilian population" for two reasons. *Id*.  First, the evidence

10

offered by the state showed that the only reason that the defendant attacked the victims was because they were rival gang members and one member of the rival gang refused to leave a party. There was no evidence to support a more panoptical intent "to intimidate or coerce the entire Mexican-American community in this Bronx neighborhood." *Id.* Further, the court found that the terrorism statute was not enacted "with the intention of elevating gang-on-gang street violence to the status of terrorism as that concept is commonly understood." *Id.*

The *Morales* court discussed the New York legislature's purposeful use of a more general definitions used within the terrorism statute and the court's reluctance to precisely define "civilian population" as follows:

> If we were to apply a broad definition to "intent to intimidate or coerce a civilian population," the People could invoke the specter of "terrorism" every time a Blood assaults a Crip or an organized crime family orchestrates the murder of a rival syndicate's soldier. But the concept of terrorism has a unique meaning and its implications risk being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act. *History and experience have shown that it is impossible for us to anticipate every conceivable manner in which evil schemes can threaten our society. Because the legislature was aware of the difficulty in defining or categorizing specific acts of terrorism, it incorporated a general definition of the crime and referenced seven notorious acts of terrorism[13] that serve as*

---

[13]*See* N.Y. Penal Law § 490.00 (McKinney 2001) ("The devastating consequences of the recent barbaric attack on the World Trade Center and the Pentagon underscore the
(continued...)

11

> *guideposts for determining whether a future incident qualifies*
> *for this nefarious designation.*

*Id.* (emphasis and footnote added). Thus, the New York court, rather than establishing a firm definition of "civil population," essentially determined, based upon the facts before it, what was not a civilian population – gang-on-gang street violence.

In contrast to *Morales*, in *State v. Laber*, 2013 WL 3283218 (Ohio Ct. App. June 11, 2013), relied upon by the State in the instant case, an employee questioned another employee regarding whether "she ever thought of shooting someone or bombing their place of employment." *Id.* at *1. The employee also commented that he "thought of shooting two co-workers and that he had three bombs and 'would start at the front office.'" *Id.* The employee was charged and convicted of making terrorist threats in violation of Ohio's statute.[14]

---

[13](...continued)
compelling need for legislation that is specifically designed to combat the evils of terrorism. Indeed, the bombings of American embassies in Kenya and Tanzania in 1998, the federal building in Oklahoma City in 1995, Pan Am Flight number 103 in Lockerbie in 1988, the 1997 shooting atop the Empire State Building, the 1994 murder of Ari Halberstam on the Brooklyn Bridge and the 1993 bombing of the World Trade Center, will forever serve to remind us that terrorism is a serious and deadly problem that disrupts public order and threatens individual safety both at home and around the world. Terrorism is inconsistent with civilized society and cannot be tolerated.").

[14]*See* Ohio Rev. Code Ann. § 2909.23(A)(1)(a)(LexisNexis 2010) ("No person shall threaten to commit or threaten to cause to be committed a specified offense when both of the following apply: (1) The person makes the threat with the purpose to do any of the following: (a) Intimidate or coerce a civilian population[.]").

Upon appeal, the Court of Appeals of Ohio determined, again based upon the facts before it and without defining "civilian population," that the "appellant conveyed threats to a fellow employee against his employer while at his place of employment. These facts are sufficient for the trier of fact to conclude that appellant meant to intimidate the population at the workplace." *Id*. at *3.

Turning to the facts before us, like the courts in *Morales* and *Laber*, we find it unnecessary to precisely define what constitutes a "civilian population" within the confines of West Virginia Code § 61-6-24. Instead, this matter is before the Court based upon the sufficiency of the evidence. In resolving this challenge, under the statute, the State had the burden of proving that the Petitioner "knowingly and willfully threatened to commit a terrorist act, with or without the intent to commit the act . . . ." *Id*. Further, according to the statute, a "terrorist act" is "[l]ikely to result in serious bodily injury or damage to property or the environment; and [][i]ntended to . . . [i]ntimidate or coerce the civilian population. . . ." *Id*.

The evidence showed that the Petitioner threatened to use explosive devices on cars belonging to employees of the credit union, which was located in Fairmont, West Virginia. A threat of this nature involved conduct that was likely to result in both serious bodily injury as well as damage to property. *Id*. Further, even though the threat was made to a credit union employee, by the express words used by the Petitioner it was "intended to

13

intimidate or coerce the civilian population" as the Petitioner threatened "to let the world know how he felt about the credit union," by not only using explosive devices, but also by "let[ting] everybody see what he was going to do, because he was going to put DVD's across our property to let everybody watch." *Id.* When the Petitioner threatened to use explosive devices in a parking lot located within a municipality, he intended his actions to "[i]ntimidate or coerce" more than just the employees of the credit union. *Id.* The Petitioner was unequivocal in his desire to seek retribution for what he viewed was the credit union's violation of his First Amendment right to freely speak about circumcision. This type of threat to use explosives in a city in this manner is precisely the type of conduct that anti-terrorism statutes were designed to target. *See Yocum*, 2014 WL 2017843 at 6 , ___ W. Va. at ___, ___ S.E.2d at ___ (quoting *Morales*, 982 N.E.2d at 585 (footnote omitted)) ("The federal antiterrorism statutes were designed to criminalize acts such as 'the detonation of bombs in a metropolitan area' or 'the deliberate assassination of persons to strike fear into others to deter them from exercising their rights'—conduct that is not akin to the serious offenses charged in this case."). Accordingly, we affirm the circuit court's determination that sufficient evidence existed to support a conviction.

## IV. Conclusion

Based upon the foregoing, the decision of the Circuit Court of Marion County is affirmed.

Affirmed.

14