[982 NE2d 580, 958 NYS2d 660]

The People of the State of New York, Appellant-Respondent,
v Edgar Morales, Respondent-Appellant.

Argued October 9, 2012; decided December 11, 2012

## POINTS OF COUNSEL

*Robert T. Johnson, District Attorney*, Bronx (*Peter D. Coddington, Justin J. Braun* and *Lindsey J. Ramistella* of counsel), for appellant. I. Violent crime committed by a street gang constitutes a crime of terrorism (Penal Law § 490.25) when it is motivated solely by the intent to establish the gang's "street credentials" as the toughest Mexican gang in the Bronx because those crimes are intended to intimidate or coerce a civilian population, to wit, the Mexican-American population of the Bronx and the members of other Mexican gangs. (*People v Concepcion*, 17 NY3d 192; *People v Levy*, 15 NY3d 510; *People v Rabb*, 16 NY3d 145; *Linde v Arab Bank, PLC*, 384 F Supp 2d 571; *Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428; *Tompkins v Hunter*, 149 NY 117; *People v Zimmerman*, 9 NY3d 421; *Matter of Taub v Altman*, 3 NY3d 30; *People v Jenner*, 39 AD3d 1083; *People v Rodriguez*, 17 NY3d 486.)

*Debevoise & Plimpton LLP*, New York City (*Catherine M. Amirfar, Daniel M. Abuhoff, Jeremy N. Klatell* and *Sonia R. Farber* of counsel), for respondent. I. The First Department correctly determined that the People had not adduced any evidence demonstrating that Edgar Morales had the intent required under the Anti-Terrorism Act. II. The terrorism convictions warrant reversal because, as a matter of law, Mexican-Americans in the St. James Park area do not constitute a "civilian population" within the meaning of the Anti-Terrorism Act. (*Holloway v United States*, 526 US 1; *United States v Santos*, 553 US 507; *People v Green*, 68 NY2d 151; *People v Rabb*, 16 NY3d 145; *People v Levy*, 15 NY3d 510; *People v McGrath*, 46 NY2d 12; *Sokolow v Palestine Liberation Org.*, 583 F Supp 2d 451; *Wultz v Islamic Republic of Iran*, 755 F Supp 2d 1; *Linde v Arab Bank, PLC*, 384 F Supp 2d 571.) III. Rival gang members do not constitute a "civilian population" within the meaning of the Anti-Terrorism Act. IV. If the Anti-Terrorism Act were construed as the People advocate, the statute would be void for vagueness. (*Kolender v Lawson*, 461 US 352; *People v Bright*, 71 NY2d 376;

*Smith v Goguen,* 415 US 566; *Papachristou v Jacksonville,* 405 US 156; *Grayned v City of Rockford,* 408 US 104.) V. The trial court's failure to dismiss the terrorism counts, in error, subverted defendant's opportunity to receive a fair trial. (*People v Baghai-Kermani,* 84 NY2d 525; *People v Doshi,* 93 NY2d 499; *People v Mahboubian,* 74 NY2d 174; *People v Berkowitz,* 50 NY2d 333; *People v Medina,* 18 NY3d 98; *Geraci v Probst,* 15 NY3d 336; *United States v Hamilton,* 334 F3d 170; *United States v Al-Moayad,* 545 F3d 139; *United States v Guiliano,* 644 F2d 85; *United States v Rooney,* 37 F3d 847.) VI. The evidence at trial was legally insufficient to support defendant's convictions. (*People v Mateo,* 2 NY3d 383; *People v Berger,* 52 NY2d 214; *People v Ohlstein,* 54 AD2d 109, 44 NY2d 896; *People v Reome,* 15 NY3d 188; *People v Moses,* 63 NY2d 299; *People v Gomez,* 39 AD3d 668; *People v Johnson,* 1 AD3d 891; *People v Jackson,* 65 NY2d 265; *People v Cabey,* 85 NY2d 417; *People v Kress,* 284 NY 452.) VII. Defendant's defense was unconstitutionally impaired by the failure of his attorney to render effective assistance at trial. (*Strickland v Washington,* 466 US 668; *People v Stultz,* 2 NY3d 277; *People v Brown,* 45 NY2d 852; *People v Gil,* 285 AD2d 7; *People v Droz,* 39 NY2d 457; *People v Wagner,* 104 AD2d 457; *Eze v Senkowski,* 321 F3d 110; *Tippins v Walker,* 77 F3d 682; *People v Chapman,* 54 AD3d 507.) VIII. Admission of gang "expert" hearsay testimony violated defendant's Sixth Amendment rights. (*Crawford v Washington,* 541 US 36; *United States v Mejia,* 545 F3d 179; *United States v Dukagjini,* 326 F3d 45; *United States v Johnson,* 587 F3d 625; *People v Hardy,* 4 NY3d 192; *Brookhart v Janis,* 384 US 1.) IX. Defendant's rights under *Payton v New York* (445 US 573 [1980]) and *Miranda v Arizona* (384 US 436 [1966]) were violated. (*People v Harris,* 77 NY2d 434; *Kaupp v Texas,* 538 US 626; *Taylor v Alabama,* 457 US 687; *People v Turriago,* 219 AD2d 383; *People ex rel. Jones v New York State Bd. of Parole,* 76 AD2d 782; *People v McIntyre,* 138 AD2d 634; *People v Pabon,* 120 AD2d 685; *People v Paulman,* 5 NY3d 122.)

*Simpson Thacher & Bartlett LLP,* New York City (*Nicholas Goldin* and *David B. Edwards* of counsel), for Center on the Administration of Criminal Law, amicus curiae. I. Terrorism is distinct from traditional gang-related crime. II. Conflating terrorism with traditional gang-related crime endangers both counter-terrorism and gang prevention efforts. III. The People need not misapply New York's anti-terrorism statute because ample statutes already exist to adequately punish gang-related crimes. (*Matter of Robinson v Snyder,* 259 AD2d 280; *People v*

*Faccio*, 33 AD3d 1041; *People v Besser*, 96 NY2d 136; *People v Sanchez*, 13 NY3d 554; *People v A.S. Goldmen, Inc.*, 9 AD3d 283; *People v Arroyo*, 93 NY2d 990.)

**OPINION OF THE COURT**

GRAFFEO, J.

Shortly after the horrendous attacks on September 11, 2001, the New York Legislature convened in special session to address the ramifications of these terrorist actions. Confronted with the tragic events of that infamous day, the legislature recognized that "terrorism is a serious and deadly problem that disrupts public order and threatens individual safety both at home and around the world" (L 2001, ch 300, § 4). It decided that New York laws needed to be "strengthened" with comprehensive legislation ensuring "that terrorists . . . are prosecuted and punished in state courts with appropriate severity" (*id.*).

The result was Penal Law article 490 and, among its provisions, was the new "crime of terrorism" (Penal Law § 490.25). It occurs when a person "commits a specified offense" with the "intent to intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping" (Penal Law § 490.25 [1]). Specified offenses include many class A and violent felonies, as well as attempts to commit those crimes (*see* Penal Law § 490.05 [3] [a], [b]). Article 490 does not, however, contain a statutory definition of "intent to intimidate or coerce a civilian population" (Penal Law § 490.25 [1]). This appeal requires us to consider whether this phrase encompasses the acts perpetrated by defendant.

## I

Defendant Edgar Morales was a member of a street gang known as the "St. James Boys" or "SJB"—apparently named for the vicinity of the Bronx where the SJB operated (running from Webster Avenue to University Avenue and from 204th Street to 170th Street). The SJB was originally formed to protect its members from other gangs and its primary objective was to be the most feared Mexican gang in the Bronx. The SJB allegedly targeted and assaulted individuals who belonged to rival confederations, extorted monies from a prostitution business and committed a series of robberies.

On the evening of August 17, 2002, several SJB members, including defendant, went to a christening party in the Bronx.

They saw a man named Miguel who they thought belonged to a gang that was responsible for a friend's death. When Miguel refused to comply with their demand to leave the party, they planned to assault him after the festivities ended. Defendant took possession of a revolver from another SJB member, agreeing to shoot Miguel if it appeared that his cohorts were losing the battle.

Around midnight, a fight broke out between the SJB members and Miguel and his companions. During the melee, an SJB member directed defendant to shoot and he fired five bullets from the handgun. Three shots hit one of the rivals and paralyzed him. A 10-year-old girl was shot in the head and died. After the SJB members fled the scene, defendant handed the gun to a female member who later passed the weapon to another SJB member. Another SJB member threw the five spent shell casings into a sewer.

After the incident, the police obtained a videotape of the christening party and using still photographs from the video, they distributed photos of suspects to the media. Subsequently, several SJB members identified defendant as one of the individuals involved in the shooting. When he was questioned by the police, defendant admitted that he attended the party but denied being the shooter, claiming that he was merely the person who carried the weapon away from the scene. Additional evidence was gathered during the investigation, including four shell casings retrieved from a sewer.

The People subsequently secured a 70-count indictment against the SJB members. Defendant, along with certain accomplices, was charged with crimes of terrorism pursuant to Penal Law § 490.25 predicated on: intentional murder in the second degree; manslaughter in the first degree; attempted murder in the second degree; gang assault in the first degree; and criminal possession of a weapon in the second degree. The underlying offenses were charged separately without the terrorism designations. Defendant and 19 others were also charged with conspiracy in the second degree based on a multitude of overt acts, including various assaults and homicides that occurred from mid-2001 to mid-2004.

During the trial, defendant challenged the sufficiency of the evidence supporting the terrorism charges. The defense argued that the activities of the SJB were "directed at rival gangs, almost exclusively" and there was "no real evidence, certainly

not evidence sufficient to get to the jury on the element of acting with intent to intimidate or coerce a civilian population." The People maintained that the targeting of other gangs was covered by Penal Law article 490 and, in any event, there was adequate proof that the SJB engaged in acts intended to intimidate or coerce all Mexican-Americans in the pertinent geographical area.

Supreme Court denied the motion, concluding that the People had established a prima facie case of terrorism based on the five designated underlying offenses. The jury convicted defendant of three crimes of terrorism under Penal Law § 490.25 premised on first-degree manslaughter, attempted second-degree murder and second-degree weapon possession, as well as second-degree conspiracy for agreeing to commit first-degree gang assault as a crime of terrorism. Defendant was sentenced to an aggregate prison term of 40 years to life.

The Appellate Division, First Department, held that there was insufficient evidence to prove an intent to intimidate or coerce a civilian population because the People established that defendant only engaged in gang-related street crimes, not terrorist acts (86 AD3d 147 [2011]). As a result, the Appellate Division modified by reducing the terrorism convictions to the three primary offenses and the conspiracy conviction was reduced from second degree to fourth degree. Defendant's other challenges—including his claim that the People's theory of terrorism unduly prejudiced the entire trial—were rejected as unpreserved or meritless.

A Judge of this Court granted leave to defendant and the People (17 NY3d 904 [2011]).

## II

The People assert that the term "civilian population" as used in Penal Law article 490 embraces all of the Mexican-Americans who resided within the SJB's designated area, as well as the subset of rival Mexican-American gangs in the same vicinity. The prosecution asks us to reinstate the terrorism convictions, contending that there was sufficient evidence that defendant's actions after the party furthered the SJB's objective to intimidate or coerce other Mexican-American gangs in the Bronx and, as a result of those activities, the SJB intended to intimidate and coerce the entire Mexican-American community during the time period charged in the indictment. Defendant argues that neither the population of Mexican-Americans in the St. James

Park neighborhood, nor the smaller category of rival gangs, can constitute a "civilian population" as a matter of law.

We begin by examining the text of article 490, which does not define the phrase "intent to intimidate or coerce a civilian population." We therefore give this language its "most natural and obvious meaning" (*People v Hedgeman*, 70 NY2d 533, 537 [1987]) based on common sense and reasonableness (*see e.g. People v Ballman*, 15 NY3d 68, 73-74 [2010]; *People v Gallagher*, 69 NY2d 525, 530 [1987]) in the context of the purpose and history of the terrorism statutes (*see e.g. People v Sanchez*, 13 NY3d 554, 565 [2009]). "Civilian population" could be read broadly to encompass a variety of communities depending on how the relevant "area" is defined and who lives within that territory.[1] Conceivably, it could range from the residents of a single apartment building to a neighborhood, city, county, state or even a country.

Like the Appellate Division, we find it unnecessary to precisely define the contours of the phrase "civilian population" for two reasons. First, even assuming that all of the Mexican-Americans in the St. James Park area may be considered a "civilian population," the evidence at trial failed to demonstrate that defendant and his fellow gang members committed the acts against Miguel and his companions with the conscious objective of intimidating every Mexican-American in the territory identified at trial. Rather, viewing the proof in the light most favorable to the People (*see People v Ramos*, 19 NY3d 133, 136 [2012]), the prosecution demonstrated that defendant and his accomplices arranged the attack because of Miguel's assumed membership in a rival gang and his refusal to leave the party. We do not believe that this discrete criminal transaction against identified gang enemies was designed to intimidate or coerce the entire Mexican-American community in this Bronx neighborhood.

Second, while there is a valid line of reasoning and permissible inferences from which the jury could have concluded that

---

**1.** *See* American Heritage Dictionary of the English Language 1366 (4th ed 2006) (defining "population" as "[t]he total number of inhabitants constituting a particular race, class, or group in a specified area"); New Oxford American Dictionary 1320 (2d ed 2005) ("a particular section, group or type of people . . . living in an area or country"); Webster's Third New International Dictionary 1766 (2002) ("a body of persons having some quality or characteristic in common and usu[ally] thought of as occupying a particular area").

one of defendant's possible goals for attacking Miguel was to intimidate or coerce another gang, there is no indication that the legislature enacted article 490 of the Penal Law with the intention of elevating gang-on-gang street violence to the status of terrorism as that concept is commonly understood. Specifically, the statutory language cannot be interpreted so broadly so as to cover individuals or groups who are not normally viewed as "terrorists" (*see generally Hedgeman*, 70 NY2d at 537) and the legislative findings in section 490.00 clearly demonstrate that the legislature was not extending the reach of the new statute to crimes of this nature. This is apparent in the examples of terrorism cited in the legislative findings: (1) the September 11, 2001 attacks on the World Trade Center and the Pentagon; (2) the bombings of American embassies in Kenya and Tanzania in 1998; (3) the destruction of the Oklahoma City federal office building in 1995; (4) the mid-air bombing of Pan Am Flight number 103 in Lockerbie, Scotland in 1988; (5) the 1997 shooting from atop the Empire State Building; (6) the 1994 murder of Ari Halberstam on the Brooklyn Bridge; and (7) the bombing at the World Trade Center in 1993 (*see* Penal Law § 490.00). The offenses committed by defendant and his associates after the christening party obviously are not comparable to these instances of terroristic acts.

We must also consider the sources that the legislature consulted in drafting the new statutes. The definitional provisions of Penal Law article 490 were "drawn from the federal definition of 'international terrorism' " (William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 490.10 at 299; *see also* Richard A. Greenberg et al., New York Criminal Law § 39:1 at 1738 [3d ed 6 West's NY Prac Series 2007] [explaining that the legislature was able to act six days after September 11th "because of the model provided by existing federal antiterrorism legislation"]). The federal antiterrorism statutes were designed to criminalize acts such as "the detonation of bombs in a metropolitan area" or "the deliberate assassination of persons to strike fear into others to deter them from exercising their rights"[2]— conduct that is not akin to the serious offenses charged in this case. Similarly, a statute extending federal jurisdiction to certain crimes committed against

---

2. These are set forth in the legislative history of the Foreign Intelligence Surveillance Act, as it was originally enacted (50 USC § 1801 *et seq.*) (*see* S Rep 95-701, 95th Cong, 2d Sess at 30, reprinted in 1978 US Code Cong & Admin News at 3999).

Americans abroad with the intent "to coerce, intimidate, or retaliate against . . . a civilian population" (18 USC § 2332 [d]) was not meant to reach "normal street crime"[3] (*see e.g. Linde v Arab Bank, PLC*, 384 F Supp 2d 571, 581 n 7 [ED NY 2005] ["drive-by shootings and other street crime," and "ordinary violent crimes . . . robberies or personal vendettas," do not satisfy the intent element of "international terrorism" under 18 USC § 2331 (1)]).

If we were to apply a broad definition to "intent to intimidate or coerce a civilian population," the People could invoke the specter of "terrorism" every time a Blood assaults a Crip or an organized crime family orchestrates the murder of a rival syndicate's soldier. But the concept of terrorism has a unique meaning and its implications risk being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act. History and experience have shown that it is impossible for us to anticipate every conceivable manner in which evil schemes can threaten our society. Because the legislature was aware of the difficulty in defining or categorizing specific acts of terrorism, it incorporated a general definition of the crime (*see generally People v Garson*, 6 NY3d 604, 612 [2006]; *People v Lang*, 36 NY2d 366, 371 [1975]) and referenced seven notorious acts of terrorism that serve as guideposts for determining whether a future incident qualifies for this nefarious designation (*see generally People v Assi*, 14 NY3d 335, 341 [2010]).

Considered in that context, and subject to possible exceptions that could arise if a criminal organization engages in terrorist activities, we conclude that the legislature did not intend for the crime of terrorism to cover the illegal acts of a gang member committed for the purpose of coercing or intimidating adversaries. Therefore, the evidence in this case was insufficient to establish defendant's guilt beyond a reasonable doubt under Penal Law § 490.25. Defendant's violent, criminal acts as a member of the SJB gang unquestionably resulted in tragic consequences— the needless death of a little girl and the paralysis of a young man—but they were not acts of terrorism within the meaning of Penal Law article 490.

---

**3.** *See* HR Conf Rep 783, 99th Cong, 2d Sess at 87, reprinted in 1986 US Code Cong & Admin News at 1960.

### III

■ On his cross appeal, defendant contends that he is entitled to a new trial on the underlying offenses specified in the terrorism counts because the theory of terrorism should not have been charged and the People were therefore permitted to introduce otherwise inadmissible evidence that unduly prejudiced the jury's ability to fairly adjudicate his guilt or innocence. We agree.

"Whether an error in the proceedings relating to one count requires reversal of convictions on other jointly tried counts is a question that can only be resolved on a case-by-case basis" (*People v Baghai-Kermani*, 84 NY2d 525, 532 [1994]). We must evaluate "the individual facts of the case, the nature of the error and its potential for prejudicial impact on the over-all outcome" (*People v Concepcion*, 17 NY3d 192, 196-197 [2011] [internal quotation marks and citation omitted]; *see also People v Doshi*, 93 NY2d 499, 505 [1999]). Reversal is required if "there is a reasonable possibility that the jury's decision to convict on the tainted counts influenced its guilty verdict on the remaining counts in a meaningful way" (*Doshi*, 93 NY2d at 505 [internal quotation marks and citation omitted]; *see also People v Daly*, 14 NY3d 848, 849 [2010]).

By proceeding on the terrorism theory, the People were able to introduce evidence about numerous alleged criminal acts committed by members of the SJB gang over the course of three years. Without the aura of terrorism looming over the case, the activities of defendant's associates in other contexts would have been largely, if not entirely, inadmissible. Based on the record, it is apparent that the volume of proof regarding unrelated assaults, murders and other offenses created a reasonable possibility that the jury's findings were prejudicially influenced. Hence, the spillover effect requires reversal and a new trial on the underlying offenses.[4]

Accordingly, on the People's appeal, the order should be affirmed. On defendant's appeal, the order should be reversed and a new trial ordered.

Chief Judge LIPPMAN and Judges CIPARICK, READ, SMITH and PIGOTT concur.

---

4. To the extent that defendant's remaining contentions must be addressed, we reject them because there was sufficient evidence to prove his guilt of the underlying specified offenses (*see generally People v Reome*, 15 NY3d 188, 192 [2010]) and the record supports the suppression court's determinations that defendant's *Payton* and *Miranda* rights were not violated.

On the People's appeal, order affirmed. On the defendant's appeal, order reversed and a new trial ordered.