People v Parker (2025 NY Slip Op 02108)

People v Parker

2025 NY Slip Op 02108

Decided on April 10, 2025

Appellate Division, Third Department

McShan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 10, 2025

CR-24-1003

[*1]The People of the State of New York, Respondent,
v
Dwight Parker, Appellant.

Calendar Date:February 11, 2025

Before: Garry, P.J., Aarons, Reynolds Fitzgerald, McShan and Mackey, JJ.

Hug Law PLLC, Albany (Matthew C. Hug of counsel), for appellant.
Lee C. Kindlon, District Attorney, Albany (Emily Schultz of counsel), for respondent.

McShan, J.
Appeal from a judgment of the County Court of Albany County (Andra Ackerman, J.), rendered June 23, 2022, upon a verdict convicting defendant of the crimes of attempted aggravated assault upon a police officer as a crime of terrorism, attempted aggravated assault upon a police officer, attempted assault in the first degree, arson in the third degree, criminal mischief in the second degree and riot in the first degree.
On May 30, 2020, after the murder of George Floyd in Minneapolis, Minnesota, dozens gathered in the City of Albany to protest. A morning protest began and ended peacefully, but a later protest devolved into a riot where protestors threw rocks at police officers, burned personal property and looted storefronts.
Following an investigation in the days that followed, law enforcement determined that defendant was present at the second protest and participated in the riot. In furtherance of the investigation, police officers executed, among other things, search warrants at defendant's residence in the City of Troy, Rensselaer County. Defendant was then arrested and subsequently charged by indictment with attempted aggravated assault upon a police officer as a crime of terrorism (count 1), attempted aggravated assault of a police officer (count 2), attempted assault in the first degree (count 3), arson in the third degree (count 4), criminal mischief in the second degree (count 5) and riot in the first degree (count 6). A jury convicted defendant as charged and County Court sentenced him to a prison term of 18 years, to be followed by five years of postrelease supervision, on count 1, a prison term of 15 years, to be followed by five years of postrelease supervision, on each of counts 2 and 3, a prison term of 2 to 6 years on each of counts 4 and 5 and a prison term of 1&frac13; to 4 years on count 6; the court directed counts 1, 2 and 3 to run concurrently to each other, counts 4 and 5 to run concurrently to each other but consecutive to counts 1, 2 and 3, and count 6 to run concurrently to all of the counts — resulting in an aggregate prison term of 20 to 24 years. Defendant appeals.
We turn first to defendant's legal sufficiency and weight of the evidence arguments directed at counts 1, 2 and 3. Relevant here, "[a] person is guilty of a crime of terrorism when, with intent to intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping, he or she commits a specified offense" (Penal Law § 490.25 [1]; see Penal Law § 490.05 [1]).[FN1] The "specified offense" (Penal Law § 490.05 [3] [a]) in this case is attempted aggravated assault upon a police officer, which a person is guilty of "when, with intent to cause serious physical injury to a person whom he [or she] knows or reasonably should know to be a police officer or a peace officer engaged in the course of performing his [or her] official duties, he [or she] [*2]causes such injury by means of a deadly weapon or dangerous instrument" (Penal Law § 120.11). Finally, "[a] person is guilty of assault in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he [or she] causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.10 [1]).
As demonstrated at trial, the peaceful protests occurring in various areas of Albany earlier in the day gave way to a tension-filled atmosphere of chaos in the evening hours. Various police officers who were present that evening testified to the scene, recounting how various protesters among the large crowd formed near the southern police station in Albany and were directing their anger toward law enforcement by shouting expletives, throwing rocks, bricks and trash cans and setting various objects on fire in the streets. Multiple sources of video footage of the scene confirmed those accounts and provided law enforcement with the means to advance the investigation into individual actors. Specifically, various angles of footage depicted an individual throwing two Molotov cocktails — a canister filled with gasoline and fitted with a lighting mechanism that, when lit and thrown, causes fire to spread in the area of impact — at a crowd of police officers. Utilizing the available video footage and observing the clothing of that individual, law enforcement traced his movements. After his arrival, the individual was observed removing two black bags from his vehicle before travelling in the direction of the southern police station. That individual later took the bags closer to the location where rioters and police were interacting and crouched over them for a period before eventually lighting one of the bags on fire and running with it. After pouring gasoline on the ground next to a fence, the individual then returns, lights the second bag on fire and throws it. Law enforcement later used a license plate reader from the downtown Albany area to determine the registered owner of the vehicle seen in the video and discovered that the owner was tied to a Troy address. Law enforcement executed a search warrant the next day, observed the vehicle in question and eventually arrested defendant.
Law enforcement then interviewed defendant, eliciting various admissions that defendant was a participant in the riot on the night in question. Specifically, defendant was shown still images derived from the video footage and conceded that it was him in the pictures. Defendant explained that he was generally concerned about police violence because his sons had come to him worried about getting into trouble and, although he "kind of" regretted throwing the Molotov cocktail, he "wanted [law enforcement] to know that they gotta stop doing what they doing too" and that, "at some point, people get tired of using their voice and still the same s**t." In line with these sentiments, the People introduced certain [*3]social media postings and search history from defendant's Facebook account. Two such postings contain a video of defendant amongst other protestors, stating, among other things, that "we came here to turn it up, we didn't come out here to talk" and that he would "burn up some s**t." In a post from the day of the riot, defendant wrote that he would be "burning th[is] b***h down and shooting what started this." Posts from defendant in the days that followed included, among other things, statements that "this [is] not the first time they had a . . . [m]arch and it was peaceful, but no change" and that "at some point, people [are] going to bug out [be]cause no one is listening, but they start killing. . . . You wake up and do anything to get the point across."
Beginning with defendant's arguments directed at counts 2 and 3, we note his failure to raise any deficiencies concerning identification or attempt evidence as issues relevant to his motion, rendering his legal sufficiency arguments unpreserved (see People v Madison, 148 AD3d 1289, 1290 [3d Dept 2017], lv denied 29 NY3d 1130 [2017]). Nevertheless, assessing the weight of the evidence on those counts — which necessarily requires that we ascertain whether each element of the offenses was established by the proof at trial — we find his arguments without merit. Several of defendant's social media posts suggested that he was present for the protests and that he harbored an intent to engage in violent conduct. Defendant's statements during his interview also reflected that he was present at the time as well as his admission to throwing at least one Molotov cocktail. Considered alongside the testimony recounting the investigation into defendant and the efforts of law enforcement to identify him as the individual engaged in such acts, the jury fairly resolved issues related to his identity as the individual in the video footage and could fairly infer his intent to cause serious physical injury to police officers and his attempt to do so by use of a dangerous instrument — specifically, two Molotov cocktails (see People v Hone, 217 AD3d 1129, 1132 [3d Dept 2023], lv denied 40 NY3d 997 [2023]; People v Ford, 156 AD3d 1242, 1244-1245 [3d Dept 2017], lv denied 31 NY3d 1013 [2018]; see also People v Serrano, 74 AD3d 1104, 1106 [2d Dept 2010], lv denied 15 NY3d 895 [2010]). Accordingly, we do not find that the verdict is against the weight of the evidence on counts 2 and 3.
However, with respect to count 1, defendant argues that his conviction is not supported by legally sufficient evidence because the conduct at issue, viewed in the light most favorable to the People, fails to establish the requisite intent to engage in an offense of terrorism as contemplated by the statute. On that argument, we agree. With respect to crimes committed as acts of terrorism, the Court of Appeals has stressed that "the statutory language cannot be interpreted so broadly so as to cover individuals or groups who are not normally [*4]viewed as 'terrorists' " (People v Morales, 20 NY3d 240, 248 [2012]). Indeed, "the concept of terrorism has a unique meaning and its implications risk being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act. History and experience have shown that it is impossible for us to anticipate every conceivable manner in which evil schemes can threaten our society. Because the [L]egislature was aware of the difficulty in defining or categorizing specific acts of terrorism, it incorporated a general definition of the crime and referenced seven notorious acts of terrorism that serve as guideposts for determining whether a future incident qualifies for this nefarious designation" (id. at 249 [internal citation omitted]; see People v Santiago, 206 AD3d 1466, 1467 [3d Dept 2022]). As reflected in the legislative findings, those acts include "(1) the September 11, 2001 attacks on the World Trade Center and the Pentagon; (2) the bombings of American embassies in Kenya and Tanzania in 1998; (3) the destruction of the Oklahoma City federal office building in 1995; (4) the mid-air bombing of Pan Am Flight number 103 in Lockerbie, Scotland in 1988; (5) the 1997 shooting from atop the Empire State Building; (6) the 1994 murder of Ari Halberstam on the Brooklyn Bridge; and (7) the bombing at the World Trade Center in 1993" (People v Morales, 20 NY3d at 248; see Penal Law § 490.00).[FN2]
At the outset, it is evident that defendant's conduct before us does not fit neatly between those guideposts. Nonetheless, the People advance the theory, both at trial and on appeal, that such acts had the effect of thwarting law enforcement from engaging in their duties of ensuring the safety of the community and enforcing the law. However, the People's theory misses the mark, as "the statute must be applied only in a manner consistent with the unique meaning of the term terrorism by requiring proof of conduct aimed at influencing, as relevant here, government action" (People v Kaplan, 168 AD3d 1229, 1230 [3d Dept 2019], lv denied 33 NY3d 1032 [2019]). More specifically, that the conduct was taken with the intent to influence a policy. The term "policy," undefined in the statute (see Penal Law § 490.05), is readily understood as "[a] standard course of action that has been officially established by an organization, business, political party" (Black's Law Dictionary [12th ed 2024], policy). In that sense, the phrase "influence the policy of a unit of government" encompasses a different intent on the part of a defendant that is more specific to a defined policy (compare People v Jenner, 39 AD3d 1083, 1086 [3d Dept 2007], lv denied 9 NY3d 845 [2007]). This is all the more evident when considering the clause that follows, as the interference with law enforcement duties referenced by the People is more aptly characterized as conduct that would "affect the conduct of a unit of government," which contains [*5]the additional requirement that it be accomplished "by murder, assassination or kidnapping" (Penal Law § 490.25 [1]). The import of this distinction is that the reference to "policy" utilized in Penal Law § 490.25 (1) requires more than a belief that the government is engaging in some form of misconduct; in this case, systemic racism or police brutality.
Through that lens, we acknowledge that, juxtaposed against the peaceful protests that erupted across the nation following the murder of George Floyd, violent protestors, including defendant, engaged in what can only fairly be characterized as a riot. Indeed, we readily agree with the People's position that "defendant crossed a clear line from peaceful protest to unlawful rioting and violence," thus warranting his convictions stemming from such conduct (see Penal Law §§ 120.10 [1]; 120.11, 145.10, 150.10, 240.06). However, the fact that defendant was motivated by his animus toward law enforcement does not in turn establish that he was attempting to influence any policy, either defined or perceived. The People's reliance on defendant's statements, both on social media and during his interview, referencing the need for "change" with respect to police brutality against Black Americans is insufficient, even considered in the light most favorable to the People, to establish that defendant intended to influence a policy as opposed to expressing his anger over his perception of pervasive racism in law enforcement across the nation (see People v Kaplan, 168 AD3d at 1231; People v Richardson, 167 AD3d 1064, 1067 [3d Dept 2018]). To be clear, there will undoubtedly be occasions when violent acts arising from protests that are directed at a defined government policy will satisfy the requirements of the statute. However, we look to the acts of violence in this case within the guideposts of the specific acts of terrorism referenced in the statute and, through that lens, we decline to loosely interpret the requirement that defendant's conduct was intended to influence a governmental policy (see People v Morales, 20 NY3d at 249; see generally People v DeBlasio, 190 AD3d 595, 595 [1st Dept 2021]; compare People v Pimentel, 149 AD3d 505, 507 [1st Dept 2017], lv denied 29 NY3d 1132 [2017]). Said simply, "[a]lthough we do not sanction defendant's [conduct], [it does] not comport with our current understanding of terrorism" and, therefore, his conviction on count 1 must be reversed (People v Richardson, 167 AD3d at 1067; see Penal Law § 490.00).
Turning to defendant's contentions concerning the introduction of social media evidence, we initially reject the premise that the statements here were subject to a Molineux analysis as the postings and search history do not contain "[e]vidence of . . . defendant's uncharged crimes or prior misconduct" (People v Weinstein, 42 NY3d 439, 455 [2024] [internal quotation marks and citations omitted]). Accordingly, despite the fact "[t]hat the People classified [the contested evidence[*6]] as Molineux evidence, and the trial court considered it on that basis," we do not find it necessary to engage in a balancing test (People v Frumusa, 29 NY3d 364, 370 [2017] [internal quotation marks and citation omitted]; accord People v Hart, 225 AD3d 1158, 1160 [4th Dept 2024], lv denied 41 NY3d 1019 [2024]; People v Slivienski, 204 AD3d 1228, 1238 n 3 [3d Dept 2022], lv denied 38 NY3d 1136 [2022]). Further, in connection with his argument that the crime of terrorism count should not have been presented to the jury, defendant contends that he "was prejudiced by the introduction of otherwise inadmissible evidence that unduly prejudiced the jury's ability to fairly adjudicate the balance of the charges." However, "[a]s defendant sought dismissal of [count 1] but did not argue that he was prejudiced by the admission of evidence relating to [it], such as by moving to sever the pertinent counts of the indictment, the [spillover] issue is unpreserved for our review" (People v Casatelli, 204 AD3d 1092, 1097 [3d Dept 2022], lv denied 38 NY3d 1132 [2022]; see People v Davison, 63 AD3d 1537, 1538 [4th Dept 2009], lv denied 13 NY3d 795 [2009]). In any event, we find that the evidence in the social media postings was not solely relevant to the terrorism count, as they are indicative of defendant's intent to engage in violent behavior on the night of the riot, the very criminal behavior for which he was on trial (see People v Slivienski, 204 AD3d at 1238; see also People v Ash, 162 AD3d 1318, 1321 [3d Dept 2018], lv denied 32 NY3d 1002 [2018]).
Finally, defendant contends that his collective sentence is harsh and excessive and asks that we reduce it in the interest of justice (see CPL 470.15 [6] [b]; see also People v Brisman, ___ NY3d ___, ___, 2025 NY Slip Op 00123, *1-2 [2025]). In assessing the merits of his request, we begin by acknowledging that defendant's criminal conduct is undoubtedly serious. The well-established right to peacefully protest is a hallmark of our society and should be vigorously encouraged; however, engaging in acts of violence in furtherance of a protest only serves to diminish that important right and, to a large degree, obscures the goals of the protest, however righteous they may be (see generally T. Andrew Brown, Peaceful Protests-Not Riots-Bring About Meaningful Change, 92 NY St BJ 18 [Aug. 2020]). To that end, the egregious acts engaged in by defendant diminished the message sought to be conveyed by the peaceful protests that were occurring across the nation. Moreover, the fact that the Molotov cocktail landed mere feet from several officers, thus reducing the classification of his felony conduct (see Penal Law § 110.05), underscores his immense good fortune that no person suffered any injuries as a result. We cannot countenance such behavior, and, to that end, we agree with the general premise advanced by the People that a lengthy sentence is fully appropriate.
That being said, although we are mindful of the People's position [*7]that defendant's initial sentence serves the need to deter others from committing similar acts, we note that the prior plea offers extended to defendant included an offer of 8 to 10 years to satisfy all of the counts of the indictment. Balanced against the severity of defendant's conduct, we note that, prior to the acts at issue, defendant had no criminal history and was by all accounts a productive member of society. Further, the presentence report indicates that, as of the time of sentencing, defendant was a father to 12 children. With all of this in mind, although County Court was legally permitted to consecutively run defendant's sentences for his separate criminal conduct involving the destruction of private property (counts 4 and 5) to the counts arising from his violence directed at law enforcement, viewing the sequence of events in their entirety, we find it more appropriate to run all of defendant's sentences concurrent to one another (see People v Harris, 206 AD3d 1454, 1461 [3d Dept 2022], lv denied 39 NY3d 940 [2022]; People v Hajratalli, 200 AD3d 1332 [3d Dept 2021], lv denied 38 NY3d 1033 [2022]; People v Williams, 195 AD3d 1168, 1169-1170 [3d Dept 2021]). Noting our dismissal of his conviction on count 1 as legally insufficient, defendant's lengthiest remaining exposure is to a determinate prison term of between 7 and 20 years, to be followed by five years of postrelease supervision, on the attempted aggravated assault upon a police officer conviction (count 2) (see Penal Law §§ 70.02 [3] [b] [ii]; 70.45 [2]). Considering the proof that defendant's conduct was aberrational based upon his lack of any criminal history, we find that a sentence at the upper end of the range originally proposed by the People in their plea negotiations is appropriate under the circumstances (see People v Mayette, 233 AD3d 1097, 1104 [3d Dept 2024]; see also People v Kerrick, 206 AD3d 1268, 1271 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]). Accordingly, in the interest of justice, we modify his sentences on counts 2 and 3 to 10-year determinate sentences, to be followed by five years of postrelease supervision. In our view, that sentence, fairly characterized as lengthy, strikes the appropriate balance by considering the severity of defendant's criminal conduct and its societal cost, while also acknowledging that the aggregate sentence that defendant initially received significantly deviates from the punishment imposed across the nation for similar conduct during the relevant time period. Defendant's remaining contentions, to the extent not explicitly addressed, have been considered and found without merit.
Garry, P.J., Aarons, Reynolds Fitzgerald and Mackey, JJ., concur.
ORDERED that the judgment is modified, on the law, by vacating defendant's conviction under count 1, vacating the sentence imposed thereon and dismissing that count; as a matter of discretion in the interest of justice, by reducing the prison sentences imposed on counts 2 and 3 to [*8]10 years determinate, to be followed by five years postrelease supervision, on each count, and by directing the sentences imposed on counts 2, 3, 4, 5 and 6 to run concurrently; and, as so modified, affirmed.

Footnotes

Footnote 1: The significance of charging a specified offense as a crime of terrorism is that, if convicted, it raises the class level of the specified felony offense by one class and thus results in greater sentencing exposure (see Penal Law § 490.25 [2] [a]-[c]). Attempted aggravated assault upon a police officer is a class C violent felony offense (see Penal Law §§ 70.02 [1] [a], [b]; 110.05, 120.11). Charged as a crime of terrorism, this offense is elevated to a class B violent felony offense (see Penal Law § 490.25 [2] [b]).

Footnote 2: The Anti-Terrorism Act of 2001 (L 2001, ch 300, § 4) was passed a mere six days after the devastating terrorist attacks on September 11. The extraordinary speed in which the legislation was passed was made possible by the existence of federal antiterrorism legislation, which provided the model for the New York analogue (see People v Morales, 20 NY3d at 248). Those circumstances, and the inclusion of the distinct acts of terrorism referenced in the legislative findings, further underscore the Legislature's understanding of the egregious nature of the conduct that could be characterized as terrorism (see Penal Law § 490.00).