| People v Mangione |
| :---: |
| 2025 NY Slip Op 33323(U) |
| September 16, 2025 |
| Supreme Court, New York County |
| Docket Number: Ind. No. 75657-24 |
| Judge: Gregory Carro |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY:  PART 32

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK    :

        -against-        :      **DECISION AND ORDER**
                                                      Ind.  75657-24

LUIGI MANGIONE,             :
                  Defendant.

                                       :

-------------------------------------------------------------------x

JUSTICE GREGORY CARRO:


On December 4, 2024, Brian Thompson, the CEO of UnitedHealthcare, was shot to death outside of the Hilton hotel in midtown Manhattan. Video surveillance captured a man wearing a mask, dressed in black and carrying a backpack, drawing a gun and shooting Thompson in the back and the leg. Video also established that before the shooting, the man drank from a water bottle and threw it in a nearby trash can, that he dropped a cellphone as he fled the scene, and that he discarded the backpack in Central Park. Investigators recovered ballistics evidence from the scene, including three shell casings, on which "depose," "delay," and "den"[1] had been written. Investigators were able to trace the shooter's movements to a hostel in Upper Manhattan, where he had registered using the name and identification of "Mark Rosario," and they also found evidence that he took a train to Philadelphia following the murder.[2]

On December 9, 2024, the defendant was arrested at a McDonald's in Altoona, Pennsylvania, after he was recognized by employees who had seen media coverage. A nine-millimeter gun was recovered from the defendant's backpack, as well as ammunition, a silencer, a fake New Jersey driver's license in the name of Mark Rosario, cash, a passport, and a notebook in which the defendant had made journal entries. There were also two letters in the backpack, one addressed to his family and one to the FBI. Ballistics analysis demonstrated that the shell casings recovered at the scene were fired by the gun found in the defendant's backpack.  DNA analysis also established that defendant's DNA was on the water bottle found at the scene, and on the

---

[1] Likely intended to read "deny."

[2] Video surveillance footage showed the man without a mask, both at the hostel and at locations before the shooting occurred. Photos of the suspect circulated on national media.

cellphone and backpack discarded by the shooter. Defendant's fingerprints were also found on the water bottle and on a Kind bar wrapper found near the scene.

Defendant was indicted for Murder in the First Degree (PL § 125.27 (1) (a) (xiii)) (victim killed in "furtherance of an act of terrorism," as defined in PL § 490.05), Murder in the Second Degree as a Crime of Terrorism (PL §§ 125.25 (1); 490.25), Murder in the Second Degree (PL § 125.25 (1)) (intentional), two counts of Criminal Possession of a Weapon in the Second Degree (PL §§ 265.03 (1) (b), 265.03 (3)), Criminal Possession of a Weapon in the Third Degree (PL § 265.02 (7)), two counts of Criminal Possession of a Weapon in the Third Degree (PL § 265.02 (8)), Criminal Possession of a Weapon in the Third Degree (PL § 265.02 (2)), Criminal Possession of a Weapon in the Fourth Degree (PL § 265.01 (9)), and Criminal Possession of a Forged Instrument in the Second Degree (PL § 170.25).

Defendant has filed an omnibus motion, seeking *Huntley, Mapp,* and *Mosley* hearings. The defendant also moves to dismiss the terrorism charges as legally insufficient, moves to dismiss the entire indictment for alleged violations of the Double Jeopardy clause, and argues that the state case should be stayed pending resolution of a concurrent federal case.[3] The People have filed a response, consenting to pre-trial hearings, and opposing the motions to dismiss and to stay the proceedings. The defendant has additionally filed a reply to the People's response, and the People have filed a sur-reply. The court has reviewed all submissions and decides as follows:

**Suppression Hearings:**

*Huntley, Mapp* and *Mosley* hearings are ordered.

**Motions to Dismiss:**

Defendant's motion to inspect the grand jury minutes for legal sufficiency pursuant to CPL § 210.30 (2) is granted. The standard of review for legal sufficiency is whether there is "competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof." CPL § 70.10 (1). Legally sufficient evidence means a prima facie case, not proof beyond a reasonable doubt. *People v Swamp*, 84 NY2d 725, 730 (1995). A court must consider "'whether the evidence viewed in the light most favorable to

---

[3]Defendant was indicted in the Southern District of New York for murder, stalking, and firearms charges based upon the same incident. The federal prosecutors have filed a notice of intent to seek the death penalty.

the People, if unexplained and uncontradicted, would warrant conviction by a petit jury.'" *People v. Bello*, 92 NY2d 523, 525-26 (1998) (quoting *People v. Jennings*, 69 NY2d 103, 114 (1986)). Penal Law provisions are generally to be construed so as to give effect to their natural and obvious meaning, particularly where the definition of a crime is at issue, because courts must be "scrupulous in insuring that penal responsibility is not 'extended beyond the fair scope of the statutory mandate.'" *People v. Hedgeman*, 70 NY2d 533, 537 (1987) (quoting *People v. Wood*, 8 NY2d 48, 51 (1960)).

Here, defendant argues that there is legally insufficient evidence of first-degree murder (alleging that the victim was killed in "furtherance of an act of terrorism"), and of second-degree murder as a crime of terrorism, and urges that the court dismiss those two counts of the indictment. Defendant argues that both legislative intent and case law demonstrate that defendant's actions do not fit within the statute and that the People did not present legally sufficient evidence of those counts. The People argue that both counts are legally sufficient, and that terroristic intent was established because the defendant was not engaged in a "personal vendetta," but "violently broadcast a social and political message" that "inspired" threats to employees of UHC.

New York's terrorism statute, set forth in article 490 of the Penal Law, was enacted on September 17, 2001, just six days after the September 11 attacks. The Legislature was able to act so quickly because it "liberally borrowed" from already-existing federal legislation. *See* Greenberg & Yurowitz, *Analyzing New York's Anti-Terrorism Statute*, NYLJ, May 13, 2002; *see also People v. Morales*, 20 NY3d 240, 248 (2012) (definitional provisions of statute drawn from federal legislation; legislature was able to act quickly because of the "'model provided by existing federal antiterrorism legislation'") (quoting Greenberg et al., *New York Criminal Law* § 39:1). The "legislative findings" state that the "devastating consequences of the recent barbaric attack on the World Trade Center and the Pentagon" establish a "compelling need" for legislation "designed to combat the evils of terrorism." PL § 490.00. The examples of terrorism cited in the legislative findings are 1) the September 11, 2001 attacks, 2) the bombings of American embassies in Kenya and Tanzania in 1998, 3) the destruction of the Oklahoma City federal office building in 1995, 4) the mid-air bombing of Pan Am Flight number 103 in Lockerbie, Scotland in

3

1988, 5) the 1997 shooting from atop the Empire State Building, 6) the 1994 murder of Ari Halberstam on the Brooklyn Bridge, and 7) the bombing of the World Trade Center in 1993. PL § 490.00.

Under PL § 125.27 [1], a person commits first-degree murder when, "with intent to cause the death of another person, he causes the death of such person," and the victim was killed "in furtherance of an act of terrorism," as defined in PL § 490.05[1][b]. Under Article 490.05[1] [b], a person is guilty of first-degree murder when they engage in activities that "involve a violent act or acts dangerous to human life," that are intended to "intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping." Similarly, a person is guilty of second-degree murder as an act of terrorism when he commits a specified offense (including second-degree murder under PL § 125.25[1]) that is intended to "intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping." PL § 490.05[1][a].

The People assert that they have established all three "intents," although they focus on "intimidat[ing] or coerc[ing] a civilian population."[4] Yet they also briefly argue that defendant intended to influence or affect the policy of a unit of government by intimidation or coercion through his actions. There was insufficient evidence presented in the grand jury to support this claim. There was no evidence presented that defendant made any demands of government or sought any particular governmental policy change, let alone that he did so by intimidation or coercion. *See People v. Parker*, 231 NYS3d 276, 282-83 (3d Dep't 2025) (that the defendant was motivated by animus toward law enforcement did not establish an attempt to influence any government policy through his actions; defendant's statement about need for "change" insufficient to establish an attempt to influence a policy as opposed to expressing anger); *cf. People v. Jenner*, 39 AD3d 1083, 1086 (3d Dep't 2007) (evidence established that defendant specifically intended to influence Department of Social Services policy). Indeed, as the federal authorities noted, the defendant's goal appeared to be to draw the public's attention to what he

---

[4] They also assert that the defendant's terroristic intent can be "inferred from the defendant's acts alone." Given the specific language and requirements of the statute, the court is unpersuaded that is the case.

4

perceived to be problems with the healthcare industry.[5] The People place great emphasis on one snatched phrase ("revolutionary anarchism") in defendant's writings to suggest that this satisfies the statutory element of an intent to "influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping."[6] Not only does this stretch the import of a two-word phrase beyond what it can carry, but it ignores other, more explicit excerpts from defendant's writings in which he states that his goal is to spread a "message" and "win public support" about "everything wrong with our health system." Therefore, the court finds that the People failed to establish an intent to "influence" or "affect" government. This court will focus on the intent element that both sides appear to emphasize – the intimidation or coercion of a civilian population.

The court will note that the term "terrorism" has been famously difficult to define.[7] Our Court of Appeals has cautioned against expanding the definition of terrorism beyond what the Legislature intended. The concept of terrorism has a "unique meaning," and its implications "risk being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act." *Morales*, 20 NY3d at 249. The legislature incorporated a "general definition of the crime," and referenced "seven notorious acts of terrorism that serve as guideposts for determining whether a future incident qualifies for this nefarious designation." *Id.*

As noted above, those "notorious acts" include the massive death and destruction of September 11, the 1998 bombings of American embassies, the 1995 destruction of the federal

---

[5] *See* U.S. Attorney's Office, Southern District of New York, Press Release, Dec. 19, 2024, *Luigi Mangione Charged with the Stalking and Murder of UnitedHealthcare CEO Brian Thompson and Use of a Silencer in a Crime of Violence.*

[6] In his notebook, defendant compared himself to Ted Kaczynski, the "Unabomber," stating that Kaczynski had "indiscriminately" mailbombed "innocents," thus crossing the line "from revolutionary anarchist to terrorist – the worst thing a person can be." The People's suggestion that this single sentence established that the defendant intended to influence governmental policy or "affect the conduct of a unit of government" is not persuasive. *See* Exhibit A, People's Affirmation in Response.

[7] The search for a definition of terrorism has been compared to the quest for the Holy Grail. *See* Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Too Many Grails*, 30 J. Legis. 249 (2004); Levitt, *Is "Terrorism" Worth Defining?*, 13 Ohio NU L. Rev. 97 (1986). Some resort to Justice Stewart's comment on obscenity, "I know it when I see it." *See* Perry, 30 J. Legis. at 250 n.8.

office building in Oklahoma, and the bombing of Pan Am Flight 103 in 1988. PL § 490.00. *See Parker*, 231 NYS3d at 282 n.2 (the inclusion of these distinct acts of terrorism underscore the Legislature's understanding of the egregious nature of the conduct that constitutes terrorism).

In *Morales*, the defendant was a street gang member operating in a particular area of the Bronx. At a christening party, the defendant fired five shots at one of his rivals, who was paralyzed; the shots also killed a 10-year-old girl. The prosecution argued that there was sufficient evidence of terrorism because the defendant intended to intimidate or coerce other Mexican-American gangs, and by inference, all Mexican-Americans in the geographical area. The Appellate Division dismissed the terrorism convictions, finding that there was no intent shown to "intimidate or coerce" the Mexican-American population residing in that particular area of the Bronx. *People v. Morales*, 86 AD3d 147, 154 (1st Dep't 2011). The court also found that members of other Mexican-American gangs in that area of the Bronx did not qualify as a "civilian population" under the statute, finding that the context of the statute weighed against "stretching the meaning of the language to cover such a narrowly defined subcategory of individuals." *Id.* at 156. Examining the legislative findings and the examples of terrorism listed, it was "clear" that the Legislature "intended to address extraordinary criminal acts perpetrated for the purpose of intimidating a broad range of people, not a narrowly defined group of particular individuals." *Id.* The court noted that it was not minimizing the "heinous nature of the criminal conduct" or the "stark tragedy of its consequences," but the conduct did not fall within the definition of terrorism. *Id.* at 161.

The Court of Appeals affirmed the Appellate Division's dismissal of the terrorism convictions and ordered a new trial on the remaining counts. The Court noted that the statute did not define the phrase "intent to intimidate or coerce a civilian population," but stated that it should be given its "most natural and obvious meaning," based on "common sense and reasonableness" in the context of the "purpose and history of the terrorism statutes." *Id.* at 247. "Civilian population" could be read "broadly" to encompass a variety of communities depending

6

on how "area" is defined and "who lives within that territory."[8] The Court found it unnecessary to "precisely define" the term "civilian population," but it concluded that "even if" all Mexican-Americans living in a particular area could be considered a "civilian population," the evidence did not demonstrate that the defendant committed his "discrete" act "with the conscious objective of intimidating every Mexican-American in the territory identified at trial." *Id.*

Moreover, the Court found that there was no indication that the legislature enacted article 490 with the intent to "elevat[e] gang-on-gang street violence to the status of terrorism as that concept is commonly understood." *Id.* at 248. "The statute cannot be interpreted so broadly so as to cover individuals or groups who are not normally viewed as 'terrorists.'" *Id.* The Court further stated that the legislature clearly did not intend to extend the reach of the statute to this type of crime, and this was "apparent" by looking to the examples of terrorism cited in the statute. The crimes committed by the defendant "obviously [were] not comparable" to those terroristic acts. *Id.*

As in *Morales*, the question presented here is whether defendant's act, no matter how heinous, fits within the definition of terrorism as set forth in the statute and as illuminated by legislative intent. This court does not believe that the legislature intended the employees of a company, however large, to constitute a "civilian population" within the meaning of the statute. Giving the phrase its "natural and obvious meaning," based on "common sense and reasonableness," it is clear that the term encompasses *inhabitants* of a particular area, or at least a group of inhabitants of a particular race or class living in a particular area. *See Morales*, 20 NY3d at 247 (term can encompass a variety of communities depending on how "area" is defined and "who *lives* within that territory") (emphasis added); *see also Morales*, 86 AD3d at 156-57 (the term and legislative history of statute implies an intention to create a "pervasively terrorizing effect on people living in a given area"; cannot stretch meaning of statute to cover a "narrowly defined subcategory of individuals"); *Muhammad v. Commonwealth*, 269 Va. 451, 499 (2005) ("population at large" requires a "more pervasive intimidation of the community rather than a

---

[8] The Court noted the dictionary definition of "population" as the "total number of inhabitants constituting a particular race, class, or group in a specified area," or a "particular section, group or type of people. . . living in an area or country, or "a body of persons having some quality or characteristic in common and usu[ally] thought of as occupying a particular area." *Id.* at 247 n.1.

narrowly defined group of people").[9]

Moreover, as in *Morales*, even if this court were to find the employees of one company to constitute a "civilian population," there was no evidence presented that defendant's *conscious objective* or *intent* was to intimidate or coerce the employees of United Healthcare. The People point to defendant's journal entries found in his backpack as evidence of terroristic intent. But those writings ultimately do not aid the People's argument. The defendant's apparent objective, as stated in his writings, was not to threaten, intimidate, or coerce, but rather, to draw attention to what he perceived as the greed of the insurance industry ("members of the public can focus on greed"), and, as an additional possible consequence, to negatively affect the financials of the company. The defendant emphasized that he wished to spread a "message" and "win public support" about "everything wrong with our health system." The defendant explicitly contrasted himself with Ted Kaczynski, the "Unabomber," because he "indiscriminately mail bomb[ed] innocents," and "cross[ed] the line ... to terrorist, the worst thing a person can be." Exhibit A to People's Affirmation in Response to Defendant's Omnibus Motion. While defendant's own characterization of his conduct is of course not dispositive, where there is no other evidence of terroristic intent, the writings fail to supply that evidence, contrary to the People's characterization. The People presented sufficient evidence that the defendant murdered Brian Thompson in a premeditated and calculated execution. That does not mean, however, that the defendant did so with terroristic intent.

Notably, the federal authorities, while recognizing that Brian Thompson was "gunned down in cold blood," did not charge the defendant with crimes of terror, but with using a firearm to commit murder and related crimes, even though the federal terrorism statute served as a model for the state statute. Regarding defendant's intent, the Acting United States Attorney for the Southern District stated that defendant's goal was a "grossly misguided attempt to broadcast [his] views across the country." The Assistant Director of the FBI stated that the defendant committed murder to "incite national debates" and that he deemed murder an "appropriate recourse to satiate

---

[9] *And see* Hurubie Meko, *In C.E.O. Murder Case, a Test of New York's Antiterrorism Laws*, N.Y. Times, Dec. 26, 2024, at A1 (former appellate judge James M. McGuire quoted as stating that it was difficult to conclude that the Legislature intended "civilian population" to "encompass persons working for health insurers who make coverage decisions").

8

personal grievances." *See* U.S. Attorney's Office, Southern District of New York, Press Release, Dec. 19, 2024, *Luigi Mangione Charged with the Stalking and Murder of UnitedHealthcare CEO Brian Thompson and Use of a Silencer in a Crime of Violence.*

The People suggest that the element of intimidation and coercion can be met because some UHC employees felt fearful after the murder, and some UHC employees received threats. But putting aside that some employees received threats even before the murder (one so serious that investigators traveled to another state to investigate), and every murder has the potential to induce some degree of fear – for example, a random murder in the subway will cause riders to feel fearful about riding the subway – that fails to establish that this was the defendant's intent, or that the conduct fits within the statutory definition of terrorism.

Using the "guideposts" of the seven examples, as directed by *Morales*, 20 NY3d at 249, defendant's crime, as in *Morales*, is similarly not "comparable" to the examples listed in the statute. There was no evidence presented of a desire to terrorize the public, inspire widespread fear, engage in a broader campaign of violence, or to conspire with organized terrorist groups. Here, the crime – the heinous, but targeted and discrete killing of one person -- is very different from the examples of terrorism set forth in the statute. The examples cited in the statute share the characteristic of *indiscriminate* killing which produce fear and terror – whether through bombing, or through the indiscriminate shooting of multiple victims. The indiscriminate nature of the shooting or bombing strikes "terror" into the population and induces a fear not to engage in daily activities for fear of violence. As the legislative findings note, terrorism "disrupts public order and threatens individual safety." PL § 490.00. The concept of terrorism has a "unique meaning" that "risk[s] being trivialized if the terminology is applied loosely in situations that do not match our collective understanding of what constitutes a terrorist act." *Morales*, 20 NY3d at 249.

This court need not reach the issue of whether the statute encompasses an act that only involves a single victim, but the court will note that the People's reliance on two of the examples set forth in the statute, the Empire State shooting and the Ari Halberstam killing on the Brooklyn Bridge, as incidents that encompassed only one victim, is misplaced. Those incidents were very different than those presented here. In the 1997 shooting at the Empire State building, the gunman, who expressed his desire for revenge for the treatment of Palestinians, opened fire with

a semi-automatic weapon on the observation deck, killing one person and wounding six others.[10] In the 1994 Ari Halberstam shooting, the gunman, motivated by a desire to retaliate against Jews, fired "shot after shot" into a van of Orthodox Jewish students, killing one and injuring three others.[11] The defendant's targeted killing of one individual – although abhorrent and despicable – is not "comparable."[12] *See Morales,* 20 NY3d at 248.

While there is no doubt that the crime at issue here is not ordinary "street crime," it does not follow that all non-street crimes were meant to be included within the reach of the terrorism statute. While the People place great emphasis on defendant's "ideological" motive, there is no indication in the statute that a murder committed for ideological reasons (in this case, the defendant's apparent desire to draw attention to what he perceived as inequities or greed within the American health care system), fits within the definition of terrorism, without establishing the necessary element of an intent to intimidate or coerce. The court agrees with the defendant that the People appear to conflate an ideological belief with the intent to intimidate or coerce a civilian population. While the defendant was clearly expressing an animus toward UHC, and the health care industry generally, it does not follow that his goal was to "intimidate and coerce a civilian population," and indeed, there was no evidence presented of such a goal. As the Third Department recently held, "we look to the acts of violence in this case within the guideposts of the specific acts of terrorism referenced in the statute," and through that "lens," the court declined to "loosely interpret" the defendant's conduct in that case as fitting within the statute. *Parker,* 231 NYS3d at 283. As in *Parker,* I do not sanction the defendant's heinous conduct, but it does not "comport with our current understanding of terrorism." *Id.; see also Morales,* 20 NY3d at 249. Here, the evidence presented failed to establish that the defendant committed the crime to coerce or intimidate a civilian population, or to influence or affect the policy of a unit of government, and therefore, the first two counts of the indictment are dismissed. The remaining

---

[10] *See* Matthew Purdy, *Empire State Gunman's Note: Kill 'Zionists,'* N.Y. Times, Feb. 26, 1997, at A1.

[11] *See* Shaila Dewan, *U.S. Decides '94 Attack on Hasidim Was Lone Act,* N.Y. Times, Dec. 6, 2000, at B9.

[12] Note that the prosecutor for Grand Traverse County, Michigan, chose to indict a defendant who stabbed 11 people at a Walmart for terrorism, because his intent was to "bring fear and destruction to a community as a whole, rather than to harm specific individuals." *Man Faces Terrorism Charge in Mass Stabbing at a Michigan Walmart,* N.Y. Times, July 27, 2025.

counts of the indictment, including murder in the second degree, are legally sufficient.

<u>Defendant's Claimed Double Jeopardy Violation and Request for a Stay</u>

Defendant argues that concurrent state and federal prosecutions violate the double jeopardy clause of the United States Constitution and CPL § 40.20, barring prosecution for two offenses based upon the same act or criminal transaction. However, as the United States Supreme Court has held, "where there are two sovereigns, there are two laws, and two offenses." *Gamble v. United States*, 587 US 678, 683 (2019). A crime "against two sovereigns constitutes two offenses because each sovereign has an interest to vindicate." *Id.* at 687. Thus, there is no double jeopardy violation.

While it is true that CPL § 40.20 grants greater protection than that of the state or federal constitution, that bar is triggered only when a prior prosecution ends in a conviction by guilty plea, or once a jury has been sworn. CPL § 40.30 (1). Therefore, because neither event has occurred, defendant's motion is premature.

Defendant nonetheless argues that he is prejudiced by concurrent proceedings, because he will be forced to litigate a federal case in which he faces the death penalty while the state case is proceeding to trial, and that testifying in the state case may prejudice him during his federal trial, thus implicating his rights to defend himself and against self-incrimination. Defendant suggests that the federal case should proceed first, even though the federal and state authorities have agreed that the state case should proceed to trial first.

This court is not persuaded that proceeding to trial in the state case first will cause the defendant severe prejudice, and the defendant's claim that any state trial testimony will prejudice his federal trial is merely speculative. *See Currier v. Virginia*, 585 US 493, 503 (2018). Moreover, defendant cites to no case law or authority that would permit such a protracted adjournment (as even defendant concedes that the federal case will take "several years" before trial). The court is also confident that counsel will have the capability to manage an approximately two-month state trial during the pendency of the "several years" before the federal case proceeds to trial. Defendant's request to stay the state proceedings is denied.

11

Summary

Counts 1 and 2, charging defendant with Murder in the First Degree (in furtherance of an act of terrorism) and Murder in the Second Degree as a Crime of Terrorism, are dismissed as legally insufficient. The People presented legally sufficient evidence of all other counts, including Murder in the Second Degree (intentional). Thus, the motion to dismiss is denied in all other respects, as is the motion to stay the proceedings.

This constitutes the decision and order of the court.

Dated: September 16, 2025

_____
Gregory Carro
Judge of the Court of Claims
Acting Justice, Supreme Court

HON. GREGORY CARRO

12